Filed 8/19/14

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.S. et al., Defendants and Appellants. | E058963 (Super.Ct.Nos. J248187, J248188) **OPINION** |

APPEAL from the Superior Court of San Bernardino County. Lily L. Sinfield, Judge. Affirmed as modified.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant A.S.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV.A, V, VII, and VIII.

1

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant P.B.

Jean-Rene Basle, County Counsel, Kristina M. Robb, and Adam Ebright, Deputy County Counsel, for Plaintiff and Respondent.

Nicole A. Williams, under appointment by the Court of Appeal, for Minors.

A.S. (mother) and P.B. (father) appeal from orders asserting dependency jurisdiction over their children, N.S. and J.S. (collectively children), and removing the children from their custody.

In the unpublished portion of this opinion, we will hold that there was insufficient evidence to support jurisdiction based on the mother's alleged failure to protect the children against sexual abuse by the father. However, there was sufficient evidence to support jurisdiction based on the mother's substance abuse; moreover, the juvenile court also found jurisdiction on other grounds, which the parents do not challenge.

In the published portion of this opinion, we will hold that there was sufficient evidence to support the removal of the children from both parents based on domestic violence. We will also hold that, even though the father's 1997 Kentucky conviction for second degree sexual abuse was a misdemeanor under Kentucky law, it constituted a "violent felony" for purposes of the denial of reunification services under California law.

We find no other error. Accordingly, we will modify the jurisdictional findings, and we will affirm the jurisdictional and dispositional orders as modified.

2

# I

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Detention Phase*.

The mother and the father have two sons together, N.S. and J.S.  N.S., the older boy, was born in 2007; he was five when this dependency was filed, and he is seven now. J.S., the younger boy, was born in 2010; he was two when this dependency was filed, and he is five now.

The father is the presumed father of N.S.  However, the mother claimed another man was N.S.'s biological father.  That other man denied paternity; he was named in the dependency as an alleged father.  The father is both the presumed and the biological father of J.S.

In March 2012, San Bernardino County Children and Family Services (Department) received a report that the children were being abused.  Allegedly, the father used drugs, and the mother allowed the children to visit the father, even though he was a registered sex offender.  When the Department investigated, the mother agreed not to let the father visit the children.  Because she "appeared protective," the investigation was closed.

Also in March 2012, the police searched the father's home pursuant to a warrant. They found a shotgun hidden between the mattress and box spring of his bed and bullets in a shed.  They also found marijuana on a dresser; the marijuana was accessible to the children, who were in the home at the time.  The father claimed to have a medical

marijuana recommendation. Eventually, he pleaded nolo contendere to unlawful possession of a firearm and unlawful possession of ammunition; charges of child endangerment and failure to register as a sex offender were dropped. He was sentenced to 16 months; with applicable credits, he was actually incarcerated for eight months, from March through November 2012.

In December 2012, the Department received a "hotline" report that the children were being abused. Allegedly, the mother hit J.S, the mother did not cook for J.S., and the mother had been prescribed Prozac but did not take it.

As a result, in February 2013, social workers interviewed the father. The children were in his home at the time.[1]

The father denied that the mother hit the children. However, he confirmed that she did not take her prescription Prozac. He said that she had "mental health illnesses."

Initially, the father also said that the mother did not use drugs. However, he then volunteered that she used methamphetamine and marijuana and was currently staying with her uncle in Simi Valley to "detox."

---

[1] It was not entirely clear where the children normally lived.

The father said that N.S. was living with the mother, and J.S. was living with him. However, he also indicated that the mother had only "dropped off" J.S. temporarily.

N.S. said that both he and J.S. "stay[ed]" with the father.

Later, the mother said that she and the father had agreed that the children would stay with him three days a week; however, she complained that he was not living up to this agreement.

4

The father admitted that, in 1997, he had been convicted of a sexual offense in Kentucky. However, he denied actually committing the offense. He explained that his ex-wife had accused him falsely of molesting her then-10-year-old daughter. He also admitted prior convictions for possession of ephedrine with the intent to manufacture methamphetamine, possession of a controlled substance, and driving under the influence.[2]

After this interview, the Department detained the children and filed dependency petitions as to them. They were placed in a foster home.

A social worker then interviewed the mother.

The mother admitted that she had been prescribed Prozac for bipolar disorder but had not taken it for a year because she no longer had Medi-Cal.

The mother also admitted that she used marijuana daily; she had started using it when she was 13. She admitted using methamphetamine in the past but claimed to have stopped in March 2007.

The mother said that she did not know the father was a sex offender until the March 2012 investigation. She claimed she did not know that the children were not supposed to have contact with him. When reminded that she had agreed to that in March 2012, she said she thought it was "okay" for him to have contact with the children

---

[2] A criminal history search revealed an additional conviction for carrying a loaded firearm in a public place.

because the charges of child endangerment and failure to register as a sex offender had been dropped.

The mother admitted that she and the father had engaged in mutual domestic violence since 2008; the most recent incident was in December 2012. She also admitted that the children had been present during the domestic violence.

B.    *Jurisdictional Phase*.

The mother's first drug test was positive for marijuana. She told a social worker that she used marijuana in lieu of Prozac for her bipolar disorder. She indicated that she was going to start taking Prozac again because she had located an inexpensive source. Just two days before making this statement, however, she had obtained a physician's recommendation for medical marijuana.

The father's first drug test was invalid due to signs that he had "attempt[ed] to flush the system." He admitted using marijuana "occasional[ly]" but agreed to quit.

The social worker made an effort to locate records relating to the father's sexual offense. The Kentucky court's case file could not be found; the records may have been destroyed in the ordinary course of business. However, the social worker was able to locate copies of some relevant records.

According to the criminal complaint, the father "placed his finger in" and "stroked" the "vaginal area" of a 10-year-old girl. "[The] victim's pants and panties were pulled down."

6

According to other records, the father was charged with first degree sexual abuse. This was later amended to "sexual abuse (solicitation)." The father was ultimately convicted of second degree sexual abuse. (Ky. Rev. Stats., former § 510.120.) We take judicial notice[3] that this statute, as relevant here, provided:

"(1) A person is guilty of sexual abuse in the second degree when: [¶] . . .

"(b) He subjects another person who is less than fourteen (14) years old to sexual contact.

---

[3] Minors' counsel is under the impression that the father was convicted of solicitation to commit first degree sexual abuse. On that basis, she has asked us to take judicial notice of the Kentucky solicitation (Ky. Rev. Stats., § 506.030) and first degree sexual abuse statutes (Ky. Rev. Stats., § 510.120).

We read the record differently. Minors' counsel is relying on the notation in the Uniform Crime Report that the charge against the father had been amended to "sexual abuse (solicitation)." The Kentucky solicitation statute, however, prohibits "command[ing] or encourag[ing] another person" to commit a crime. (Ky. Rev. Stats., § 506.030, subd (1).) It is clear that the father did not solicit *a third person* to commit sexual abuse *against the victim*. Other records indicated that the father was required to register as a sex offender in California because he had been convicted in Kentucky of "second degree sexual abuse" — not solicitation.

We therefore conclude that the father was actually convicted of second degree sexual abuse. (Ky. Rev. Stats., § 510.120.) The vague notation on the Uniform Crime Report must mean that he was charged with committing sexual abuse by (or in the course of) soliciting *the victim*.

Finally, what matters is how the relevant Kentucky statutes read in 1997, not how they read today. Accordingly, we will take judicial notice of Kentucky Revised Statutes, section 510.120, as it stood in 1997. (Ky. Stats. 1988, ch. 283, § 14.)

We will also take judicial notice of Kentucky Revised Statutes, section 510.010, as it stood in 1997 (Ky. Stats. 1996, ch. 300, § 2), because it defined "sexual contact" as used in Kentucky Revised Statutes, section 510.120.

7

"(2) Sexual abuse in the second degree is a Class A misdemeanor."

"Sexual contact" was defined as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party . . . ." (Ky. Rev. Stats., former § 510.010, subd. (7).)

The father was sentenced to 28 days in jail and 337 days of probation. According to him, he was not required to register as a sex offender in Kentucky. However, he was registered as a sex offender in California, based on the Kentucky conviction.

Once again, the father denied actually committing the offense. He explained that his girlfriend's 10-year-old daughter was playing outside "and got a burr in her genital area and he helped her remove it. A neighbor witnessed this and told the mom. . . . [The girlfriend] wanted to leave him any way [*sic*] and took this information and ran with it." He pleaded guilty just "to get out of jail."

N.S. denied any sexual abuse. J.S. was too young to be interviewed.

The mother took four drug tests — three in April 2013 and one in May 2013. The first was positive; the second was negative but had a suspicious specimen temperature; the third was positive; and the fourth was negative.

The father also took four drug tests, all negative.

In the jurisdictional/dispositional report, the Department recommended that the children be removed and that both parents be given reunification services. Prior to the hearing, however, as a result of mediation, the Department and the parents agreed that the

8

children should be placed with the mother on a family maintenance plan. Minors' counsel did not agree with this and requested a contested hearing.

After a further mediation session, the Department and the father agreed that the father should receive reunification services. Again, minors' counsel did not agree with this.

C. *The Jurisdictional/Dispositional Hearing*.

In June 2013, at the jurisdictional/dispositional hearing, all of the social worker's reports were admitted into evidence. In addition, there was the following oral testimony.

The mother's adult daughter testified that she had lived with both the mother and the father for about a year and a half, between the ages of 16 and 17. During this time, she never saw any inappropriate behavior by the father.

The mother testified that, when the children were detained, she was staying with her uncle, but she denied that she was there to "detox." She had used methamphetamine between the ages of 13 and 16, stopping when she was pregnant with her daughter; she had used it again between the ages of 30 and about 32, stopping when she met the father.

The mother denied using any marijuana since the children were detained. She explained that she had had positive drug tests because "it takes up to three months to get out of your system." She was taking Prozac and Lorazepam for her bipolar disorder. She was under treatment by both a psychiatrist and a general practitioner.

The mother testified that she did not believe the father had been convicted of a sexual offense, because he was not required to register in Kentucky. However, she promised to follow any court orders limiting his contact with the children.

The father testified that he and the mother shared custody of the children: "We worked out an agreement that I would have them . . . three days a week, she would have them four, and at various times that would alter where I would have them four days, she would have them three."

He denied any domestic violence.

He reiterated that his Kentucky conviction arose out of the removal of burrs from his girlfriend's daughter's panties, at the child's request. He denied removing her panties or touching her vagina.

According to the father, he had been advised that, under Kentucky law, because he was not the girl's biological father, he "wasn't supposed to be touching [her] whatsoever." Based on that understanding, he pleaded guilty.

The juvenile court sustained the following allegations as to both children:

"B-1 The mother . . . failed to protect the child . . . in that her substance abuse issues severely impact her ability to provide for the well[-]being of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or neglect.

"B-2 The mother . . . has unresolved mental health needs which severely impact her ability to provide for the well[-]being of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or neglect.

10

"B-3  The mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a history of sexually offending minors [*sic*], history of violent assaultive behavior, history of anger management issues, history of drug deals, all of which place the child[] . . . at a significant and substantial risk o[f] harm and/or death.

"B-4  The mother . . . engages in acts of domestic violence with the father . . . while in the presence of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or abuse."

In addition, it sustained the following allegations solely as to J.S.:

"B-5  The father . . . failed to protect the child . . . in that his substance abuse issues severely impact his ability to provide for the well[-]being of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or neglect.

"B-7  The father . . . failed to protect the child . . . in that he engages in acts of domestic violence with the mother . . . while in the presence of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or abuse."[4]

The juvenile court therefore found jurisdiction based on failure to protect.  (Welf. & Inst. Code, § 300, subd. (b).)  It formally removed the children from the parents'

---

[4]     These allegations were omitted from the petition as to N.S., presumably because there was a question as to whether the father was N.S.'s biological father.

The petition as to N.S. did include allegations as to the other man who was N.S.'s alleged father.  Those allegations, however, would not have been sufficient to support jurisdiction in the absence of allegations as to the mother.

11

custody. It ordered reunification services for the mother; however, it denied reunification services for the father, on two grounds: (1) that he had been convicted of a violent felony (Welf. & Inst. Code, § 361.5, subd. (b)(12)) and (2) that he was required to register under the Adam Walsh Child Protection and Safety Act of 2006 (*id*., subd. (b)(16)).

II

REFUSAL TO ALLOW THE MOTHER TO SUBSTITUTE RETAINED COUNSEL

The mother contends that the juvenile court erred by refusing to allow her to substitute privately retained counsel before the jurisdictional/dispositional hearing.

A.    *Additional Factual and Procedural Background.*

At a pretrial settlement conference, attorney Guy Bovee appeared and stated that he intended "to substitute in for mother and father . . . ."

Counsel for the Department objected that there was a conflict of interest in representing both parents.

The father indicated that he did not believe there was any conflict: "[T]he mother and I are both on board as far as the same page. I mean, we both want the same thing."

After a lunch break, Bovee argued that he should be allowed to represent both parents because "the most that we have at this point . . . is possibly a potential conflict . . . . [¶] . . . I don't think we have an actual conflict at this point."

The trial court asked Bovee if he had the parents' written consent to any conflict of interest. He answered, "I believe I included that in a document that I had signed. It's not before the Court."

12

The trial court also asked Bovee if he had "had a conversation with both parents." He confirmed that he had and that "there has been an exchange of . . . confidential information." He added, "I could still represent mother provided that [father] consented to it."

The trial court then ruled that it would not allow Bovee to represent the mother.

B. *Analysis.*

"Although the right to be represented by retained counsel in civil actions is not expressly enumerated in the federal or state Constitution, our cases have long recognized that the constitutional due process guarantee does embrace such a right. [Citations.]" (*Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 925-926.) "But the right to representation . . . is not unlimited and must be considered and balanced with any possible detriment to other parties and the efficient administration of justice. [Citation.]" (*Forrest v. Department of Corporations* (2007) 150 Cal.App.4th 183, 199-200, disapproved on unrelated grounds in *Shalant v. Girardi* (2011) 51 Cal.4th 1164, 1172, fn. 3.)

Likewise, a criminal defendant who is not indigent has the right to retained counsel. (*Chandler v. Fretag* (1954) 348 U.S. 3, 9-10.) Again, however, this right is not absolute. "The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' [Citation.]" (*People v. Courts* (1985) 37 Cal.3d 784, 790.) A trial court

13

can override a criminal defendant's right to decide how to defend himself if "it will result in 'significant prejudice' to the defendant or in a 'disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citation.]" (*People v. Ortiz* (1990) 51 Cal.3d 975, 982.)[5]

"While we recognize that courts should exercise their power to remove defense counsel with great circumspection [citations], they nevertheless retain the obligation to supervise the performance of defense counsel to ensure that adequate representation is provided. [Citations.] Thus, a trial judge may remove defense counsel despite the objections of the defendant and his attorney if a serious conflict of interest arises during the trial proceedings resulting in 'an obviously deficient performance. Then the court's power and duty to ensure fairness and preserve the credibility of its judgments extends to

---

[5] We have not found any statutory right to retained counsel of one's choice at a jurisdictional hearing.

Subdivisions (a) and (b) of Welfare and Institutions Code section 317 give an *indigent* parent a right to *appointed* counsel; they do not confer any more general right to counsel.

Welfare and Institutions Code section 349 provides that, in a dependency case, "any person entitled to notice of *the hearing* under the provisions of Sections 290.1 and 290.2" . . . "has the right to be represented at *the hearing* by counsel of his or her own choice." (Welf. & Inst. Code, § 349, subds. (a), (b), italics added.) Welfare and Institutions Code sections 290.1 and 290.2 provide that parents (among others) are entitled to notice of the initial petition hearing (i.e., the detention hearing; see Welf. & Inst. Code, § 319). Thus, it appears that Welfare and Institutions Code section 349 gives parents a statutory right to counsel of their choice, but only at the detention hearing.

recusal even when an informed defendant, for whatever reason, is cooperating in counsel's tactics.' [Citation.]" (*People v. McKenzie* (1983) 34 Cal.3d 616, 630.)

We review the trial court's ruling for abuse of discretion. (See *People v. Panah* (2005) 35 Cal.4th 395, 426.)

Rule 310(C) of the Rules of Professional Conduct (Rule 3-310(C)) provides:

"A member shall not, without the informed written consent of each client:

"(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

"(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict . . . ."

"Under California law, the mere consultation with a prospective client may create a disqualifying conflict of interest for a lawyer, especially where confidential information was disclosed." (*In re Tevis* (9th Cir. BAP 2006) 347 B.R. 679, 692.) "'"The fiduciary relationship existing between lawyer and client extends to preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result." [Citation.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1147-1148.) "The primary concern is whether and to what extent the attorney acquired confidential information. [Citation.]" (*Id.* at p. 1148.) "An attorney represents a client — for purposes of a conflict of interest analysis — when the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result. [Citations.]" (*Ibid.*)

15

Here, Bovee conceded that he had obtained confidential information from both parents. Moreover, he had agreed to represent both of them, and he even attempted to substitute in for both of them. Manifestly, he had already accepted the representation of both parents, in violation of Rule 3-310(C).

Moreover, as Bovee also all but conceded, there was at least a potential conflict of interest between the parents. "There is always a potential conflict between the interests of parents in a dependency case, even though at the outset their interests appear to be congruent. Although it is theoretically possible to represent both parents with the informed written consent of both, most practitioners agree that an attorney should never represent both parents." (Cal. Juvenile Dependency Practice (Cont.Ed.Bar. 2013) Representing Parents, § 11.10.) Thus, "[i]n a dependency case, each parent generally has separate counsel." (*In re Celine R.* (2003) 31 Cal.4th 45, 55.)

Basically, the mother's whole argument is that Bovee still could have represented her because the father was willing to waive any conflict. It is not at all clear that the father was willing to do so. He indicated that he wanted Bovee to represent *both* him *and* the mother. This does not mean, however, that he would have consented to Bovee representing just the mother, which would have meant, if necessary, opposing him.

In any event, under Rule 3-310(C), any waiver would have had to be both "informed" and "written." Bovee never produced a written waiver. He vaguely suggested that one existed, but he admitted that the document was "not before the Court."

16

Even assuming a written waiver existed, there was no evidence that it was informed. Informed consent would require "full disclosures as to the risks of the representation[], the potential conflicts involved, and the alternatives available . . . . [Citations.]" (*Sharp v. Next Entertainment Inc.* (2008) 163 Cal.App.4th 410, 430.) There was no evidence that such disclosures had been made to the father.

The mother complains that the trial court "found that a conflict existed without determining whether father would waive . . . ." This rather conveniently ignores the applicable burden of proof. Once there was prima facie evidence that Bovee had accepted a prohibited representation, the burden of showing a waiver fell squarely on the mother. (Cf. *Tritek Telecom, Inc. v. Superior Court* (2009) 169 Cal.App.4th 1385, 1390 ["Once a party establishes that a privilege applies, the burden shifts to the party opposing the privilege to demonstrate . . . that there was an express or implied waiver."].) She failed to carry this burden.

We therefore conclude that the trial court did not err by ruling that Bovee was disqualified from representing the mother.

III

JURISDICTIONAL FINDINGS

A.      *Justiciability.*

The mother contends that there was insufficient evidence to support jurisdiction based on either her alleged substance abuse or her alleged failure to protect the children against sexual abuse by the father.

17

The juvenile court, however, also found jurisdiction based on the mother's (1) "unresolved mental health needs," (2) failure to protect the children in light of the father's "history of violent assaultive behavior, history of anger management issues, [and] history of drug deals," and (3) participation in domestic violence. The mother does not dispute the sufficiency of the evidence to support these findings. Minors' counsel therefore argues that her contention is not "justiciable." (Capitalization altered.)

In general, "'[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

However, there are exceptions to this rule: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Here, the challenged jurisdictional findings did, in fact, serve as the basis for the dispositional orders, which the mother is also challenging. In explaining its dispositional orders, the juvenile court specifically cited the mother's continued use of marijuana and her lack of "insight" with regard to the father's sexual offense conviction. Similarly, in defending the dispositional order on appeal, the Department argues, among other things, that the mother's continued use of marijuana and her refusal to believe that the father was a sex offender amounted to evidence of a substantial risk. Neither the court nor the Department has ever claimed that the other jurisdictional allegations presented any continuing risk requiring removal.

"The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135.) Here, if we were to refuse to consider the sufficiency of the evidence to support jurisdiction based on substance abuse or on failure to protect against sexual abuse, we would still have to consider the sufficiency of the evidence to support removal on these grounds. Accordingly, the mother's challenge is justiciable in this case.

B.     *Merits*.

Under Welfare and Institutions Code section 300, subdivision (b), the juvenile court has jurisdiction based on failure to protect when: "The child has suffered, or *there is a substantial risk that the child will suffer, serious physical harm or illness*, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to

19

adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, *or by the inability of the parent or guardian to provide regular care for the child due to the parent's* or guardian's mental illness, developmental disability, or *substance abuse*. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (Italics added.)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

"'" . . . 'The basic question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'"' [Citation.]" (*In re Marquis H*. (2013) 212 Cal.App.4th 718, 724, italics added.) Nevertheless, "[i]n determining whether the child is in present need of the juvenile court's protection, the

20

court may consider past events. [Citation.]" (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169.) "A parent's past conduct is a good predictor of future behavior. [Citation.]" (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] . . . [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

        1.     *Jurisdiction based on the mother's substance abuse*.

There was ample evidence that the mother had a long-standing habit of marijuana use. She admitted that she had used marijuana since she was 13; she also admitted that she was using it when the dependency was filed. According to the father, she left the children with him so she could "detox." Her very first drug test was positive for marijuana.

The mother argues that there was no evidence that her marijuana use placed the children at risk. However, in cases involving "children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health

21

and safety," a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 767.) Here, both children were of tender years — toddlers, not yet in school, who required constant care and attention.

The mother also argues that her marijuana *use* did not constitute substance *abuse*. She relies on *Drake M.*, which held "that a finding of substance abuse for purposes of section 300, subdivision (b), must be based on evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM–IV–TR. The full definition of 'substance abuse' found in the DSM–IV–TR describes the condition as '[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period: [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)[; ¶] (3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the

effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights).' [Citation.]" (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766.)

We may assume, without deciding, that *Drake M.* is good law on this point. Even if so, there was substantial evidence that the mother's conduct fell within *Drake M.*'s definition of substance abuse, in that her "recurrent substance use result[ed] in a failure to fulfill major role obligations . . . ." According to the father, when the dependency was filed, the mother had left the children with him so she could "detox." The mother argues that there was "no evidence to support the [father's] claim," but there did not have to be. "'"[T]he testimony of a single witness is sufficient to uphold a judgment."'" [Citation.]" (*In re Lana S.* (2012) 207 Cal.App.4th 94, 104.)

The mother argues that her positive test results were not substantial evidence that she was actually using marijuana *during the dependency*. She cites her own testimony that marijuana can remain in the body for up to three months. However, the juvenile court was not required to believe this; in the absence of any expert testimony, it was a reasonable inference that a positive drug test indicated recent drug use.

Indeed, the juvenile court specifically found that the mother's testimony on this point was not credible: "[A]lthough there was no testing about that, I think the Court can glean from reasonable inferences and common sense as well that she is a slender woman, and I don't find it credible that it will take three months to get it out of her system."

The mother calls this reasoning "speculation," and complains that it "finds no support in the record." The juvenile court judge, however, evidently knew that THC

23

metabolites are fat-soluble, so that detection time can be affected by body weight. (Cary, The Marijuana Detection Window, 5 Drug Court Rev. 23, 32, available at <http://www.ndci.org/sites/default/files/ndci/DCR.VI__2.pdf>, as of Apr. 3, 2014.)[6] Even jurors are entitled "to use their experience in evaluating and interpreting th[e] evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [jurors did not commit misconduct by relying on personal experiences related to drugs; "[t]he effect of drugs, while certainly a proper subject of expert testimony, has become a subject of common knowledge among laypersons."].) "Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work." (*In re Malone* (1996) 12 Cal.4th 935, 963.) A fortiori, a judge, when acting as trier of fact, can rely on his or her general knowledge.

We therefore conclude that the finding of jurisdiction based on the mother's substance abuse was supported by substantial evidence.

> 2. *Jurisdiction based on the mother's failure to protect against sexual abuse by the father*.

The mother mounts a two-pronged attack on the finding of jurisdiction based on failure to protect against sexual abuse. First, she argues that there was insufficient

---

**6** The judge may even have known that even a chronic user is unlikely to test positive (at the 50 mg/ml cutoff level, which was used here) more than 10 days after use. (Cary, The Marijuana Detection Window, *supra*, 5 Drug Court Rev. at p. 42.)

evidence that the father actually committed a sexual offense. Second, she argues that the commission of the sexual offense was insufficient evidence of a current substantial risk of physical harm.

The father's guilty plea constituted an admission that he was guilty as charged. (*People v. Howard* (1992) 1 Cal.4th 1132, 1180; see also *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1051-1052.) Although it was hearsay, hearsay in a social worker's report is "both admissible and competent evidence on which to base a finding of jurisdiction pursuant to section 300." (*In re Malinda S.* (1990) 51 Cal.3d 368, 385.) Moreover, it was admissible against both parents, even under standard hearsay principles, as a prior inconsistent statement. (Evid. Code, § 1235; see also *People v. Hawthorne* (1992) 4 Cal.4th 43, 55, fn. 4 ["prior inconsistent statements are admissible to prove their substance as well as to impeach the declarant."].) Finally, in closing argument, the father's counsel conceded that "a sexual offense occurred as found by the Kentucky court . . . ." Thus, there was substantial evidence that the father did actually commit a sexual offense against a minor.

We do agree with the mother, however, that the commission of this sexual offense was insufficient evidence of current risk, for several reasons.

First, the victim was female, whereas N.S. and J.S. are male. Recently, in *In re I.J.*, *supra*, 56 Cal.4th 766, the California Supreme Court held that a father's "severe and prolonged" sexual abuse of his own female child showed a substantial risk that he would sexually abuse her male siblings, so as to support jurisdiction based on abuse of a sibling

25

under Welfare and Institutions Code section 300, subdivision (j).  (*In re I.J.*, *supra*, at pp. 779-780.)  In the course of doing so, however, it noted the breadth of this particular subdivision:  "' . . . The provision . . . accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.'  [Citation.]"  (*Id.* at p. 774.)  It stated, "the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300.  If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse."  (*Id.* at p. 778.)  "Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse."  (*Id.* at p. 778.)  It cautioned, "[W]e are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused."  (*Id.* at p. 780.)  It concluded, "The serious and prolonged nature of father's sexual abuse of his daughter under these circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children."  (*Id.* at p. 778.)

The facts on which the Supreme Court relied in finding substantial evidence of risk in *I.J.* are conspicuously absent here.  First, and most obviously, the victim in *I.J.*

was a sibling. Thus, there was evidence that that father would molest his *own* children; moreover, as the court noted, the molestation occurred in the home in which the other children were living and thus constituted a violation of trust as to them, as well as to the victim. That was not the case here.

In addition, here, the father's sexual offense, although vile, was not serious, severe, or prolonged, when compared to other child sexual offenses. We may accept the statement of facts in the Kentucky criminal complaint. The father argues that it was hearsay and unauthenticated. The mother argues that it is not supported by any "witness statement[s]," and therefore it is "not evidence; it is merely an allegation." However, neither parent objected to it below.[7] "'"'[I]t is settled law that incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding.'" [Citations.]' [Citation.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 132-133.) This evidence, however, showed a one-off event. No threats, force, or violence was involved. The father used a finger, not his penis. There was no evidence of penetration, only that his finger was "in" her "vaginal area."

---

[7] In a single sentence, the father argues that his trial counsel's failure to object to the complaint constituted ineffective assistance of counsel. However, "[t]he decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel. [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.) The father's position below was that he was falsely accused by his soon-to-be-ex-girlfriend; in this light, the complaint was equally false, so its particular allegations were irrelevant. The father's trial counsel could also have reasoned that the elements of the Kentucky offense, when combined with the father's guilty plea, were sufficient to establish much the same conduct.

The sexual offense was remote — it had occurred almost 16 years before the children were removed. There was no evidence that the father had committed any other sexual offenses in the meantime. To the contrary, there was affirmative evidence that he had not molested the mother's older daughter when she lived with him. N.S. was questioned, and he denied any molestation.

Finally, it is significant that this case involves not subdivision (j), but subdivision (b) of Welfare and Institutions Code section 300. Subdivision (j) can be satisfied by substantial risks of several kinds, including a substantial risk of sexual abuse. By contrast, subdivision (b) specifically requires a substantial risk of serious physical harm or illness.[8] The father's sexual offense did not involve any risk of physical harm to the victim in that case. A fortiori, it afforded no evidence of a risk of physical harm to J.S. or N.S.

For the sake of completeness, we consider the effect of Welfare and Institutions Code section 355.1, subdivision (d). That subdivision provides: "Where the court finds that . . . a parent . . . has been previously convicted of an act in another state that would constitute sexual abuse as defined in Section 11165.1 of the Penal Code if committed in this state, . . . that finding shall be prima facie evidence in any proceeding that the subject

---

[8] Subdivision (d) of Welfare and Institutions Code section 300 provides for jurisdiction when "there is a substantial risk that the child will be sexually abused . . . by his or her parent . . . or a member of his or her household, or the parent . . . has failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse." The Department has never relied on this subdivision in this case.

28

minor is a person described by subdivision (a), (b), (c), or (d) of Section 300 and is at substantial risk of abuse or neglect. The prima facie evidence constitutes a presumption affecting the burden of producing evidence."

Sexual abuse, as defined in Penal Code section 11165.1, includes "[t]he intentional touching of the genitals or intimate parts (including the breasts, genital area, groin, inner thighs, and buttocks) . . . of a child . . . for purposes of sexual arousal or gratification . . . ." (Pen. Code, § 11165.1, subd. (a)(4).) Thus, the presumption in Welfare and Institutions Code section 351, subdivision (d) did apply here.

The presumption, however, is what has been called an "exploding presumption" (e.g., *Rossetto v. Pabst Brewing Co., Inc.* (7th Cir. 2000) 217 F.3d 539, 544): It "only survives until there is rebuttal evidence submitted." (*In re Esmeralda B*. (1992) 11 Cal.App.4th 1036, 1041.) Here, the parents did introduce rebuttal evidence. Hence, the presumption has no effect.

We therefore conclude that the finding of jurisdiction based on the mother's failure to protect against sexual abuse by the father was not supported by substantial evidence.

IV

DISPOSITIONAL FINDINGS

Both parents contend that there was insufficient evidence to support the removal of the children from their custody.

29

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.] The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.V.*, *supra*, 217 Cal.App.4th at pp. 135-136.)

"We review the court's dispositional findings for substantial evidence. [Citations.]" (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 136.) Both parents stress the fact that the burden of proof in the lower court is clear and convincing evidence. But "[t]he 'clear and convincing' standard is for the edification and guidance of the juvenile court. It is not a standard for appellate review. [Citation.] '"The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.]" (*In re J.I.* (2003) 108 Cal.App.4th 903, 911.)

30

A.     *Removal from the Mother Based on Substance Abuse*.

We disregard the jurisdictional finding based on the mother's failure to protect against sexual abuse; as we have already held (see part III.B.2, *ante*), it was not supported by substantial evidence. However, this leaves jurisdictional findings based on the mother's substance abuse, "unresolved mental health needs," domestic violence, and failure to protect against the father's "history of violent assaultive behavior, history of anger management issues, history of drug deals . . . ."

We can sustain the removal from the mother based on her substance abuse alone. She argues that she was not still using marijuana at the time of the dispositional hearing. As already discussed, however, her positive drug tests were substantial evidence that she was still using marijuana. Admittedly, her last positive test was in late April 2013; she did not have any positive tests in May 2013, and the dispositional hearing was in early June 2013. The juvenile court, however, could reasonably conclude that a single month of abstinence was insufficient to eliminate the risk to the children. "[R]elapses are all too common for a recovering drug user. 'It is the nature of addiction that one must be "clean" for a . . . long[] period . . . to show real reform.' [Citation.]" (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423–424.)

The mother argues that ongoing drug testing constituted a reasonable means of protecting the children. However, there was evidence that she was continuing to use drugs despite drug-testing. Also, there was evidence that she was noncompliant with reunification services. She was supposed to start parenting classes, but she had not done

31

so; in the social worker's opinion, she "had the attitude that the kids are wrongly detained. They are going to go back to her so she is not going to start these things." Thus, the juvenile court could reasonably find that there were no reasonable means of protecting the children short of removal.

B. *Removal from Both Parents Based on Domestic Violence*.

Domestic violence afforded cause to remove the children from both parents. The mother admitted incidents of mutual domestic violence going back to 2008. The mother argues that it was no longer a concern, because she was not living with the father. However, she admitted that the most recent incident was in December 2012, when they were already not living together. Meanwhile, in the social worker's opinion, the mother was "dependent" on the father. There was still a "relationship" between them; they had "various needs for each other." Thus, again, the juvenile court could reasonably find that removal was necessary.

The father relies on *In re Basilio T*. (1992) 4 Cal.App.4th 155, which held that two incidents of domestic violence between the parents afforded insufficient evidence to support removal, because "neither incident directly affected either minor physically . . . ." (*Id*. at p. 171.)

The law, however, has changed significantly since *Basilio T*. was decided. At that time, the relevant subdivision of Welfare and Institutions Code section 361 allowed removal only if there was "a substantial danger to the physical health of the minor . . . ." (Welf. & Inst. Code, former § 361, subd. (b)(1), Stats. 1990, ch. 182, § 7.) Since then,

32

however, the subdivision has been amended (Stats. 1996, ch. 1084, § 4; Stats. 1996, ch. 1139, § 8.5) so that it now allows removal if there is "a substantial danger to the physical health, *safety, protection*, or *physical or emotional well-being* of the minor . . . ." (Welf. & Inst. Code, § 361, subd. (c)(1), italics added.)  Ongoing domestic violence, committed by both parents, in the presence of the children, from 2008 through 2012, is substantial evidence of a substantial danger to the children's emotional well-being, if not their physical well-being.

V

THE FATHER'S RIGHT, AS A NONOFFENDING PARENT,

TO CUSTODY OF N.S.

As mentioned earlier, the petition regarding N.S. did not include any allegations as to the father.  The father therefore argues that, with respect to N.S., he was a nonoffending parent and, as such, entitled to custody under Welfare and Institutions Code section 361.2.

Welfare and Institutions Code section 361.2, subdivision (a), provides:  "When a court orders removal of a child . . . , the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

33

Preliminarily, the father forfeited this contention by failing to raise it below. "Failure to object to noncompliance with section 361.2 in the lower court results in forfeiture. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 605-606 [Fourth Dist., Div. Two]; accord, *In re John M.* (2013) 217 Cal.App.4th 410, 419; contra, *In re Abram L.* (2013) 219 Cal.App.4th 452, 462; *In re V.F.* (2007) 157 Cal.App.4th 962, 968.) The father's trial counsel never argued that the father was entitled to custody, under Welfare and Institutions Code section 361.2 or otherwise; she merely argued that he was entitled to reunification services.

Separately and alternatively, the juvenile court could and did find that N.S. was residing with the father, which would mean that Welfare and Institutions Code section 361.2, subdivision (a) did not apply. (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 608 ["the parent must be *both* nonoffending *and* noncustodial . . . in order to be entitled for consideration under section 361.2 . . . ."].) The father testified that he and the mother shared custody of the children, who lived with him three or four days a week. In closing argument, the father's counsel affirmatively asserted that there was an "informal split custody" arrangement. The juvenile court specifically found that "[c]ontinuance" in the father's home would be detrimental.

Finally — and again, separately and alternatively — the claimed error was harmless. As noted, the juvenile court found that continuance in the father's home would be detrimental. However, it also specifically found that "placement with [the] non-custodial parent [would be] detrimental . . . ." This cannot be construed as limited to the

34

man who was the alleged father of N.S., because the juvenile court also made the same finding with respect to J.S. Rather, it appears that, in light of the uncertainty in the record as to where the children were residing, the juvenile court hedged its bets by making alternative findings. In any event, given its finding that N.S. should be removed from the father's custody, the juvenile court necessarily would also have found that it was detrimental to place N.S. with the father.

VI

THE DENIAL OF REUNIFICATION SERVICES TO THE FATHER

The father contends that the juvenile court's reasons for denying him reunification services were not supported by substantial evidence.

As discussed, the father had been convicted of second degree sexual abuse under Kentucky law. Although this was a misdemeanor, it was equivalent to the California felony of a lewd and lascivious act with a child under 14. (Pen. Code, § 288, subd. (a).)

Under Welfare and Institutions Code section 361.5, subdivision (b)(12) (subdivision (b)(12)), a parent is not entitled to reunification services when the court finds, by clear and convincing evidence, "[t]hat the parent . . . has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5 of the Penal Code."

Penal Code section 667.5 provides enhancements for prior prison terms. If the defendant is convicted of a violent felony, and if the defendant served a prior prison term for a violent felony, it provides (subject to exceptions not relevant here) for a three-year enhancement. (Pen. Code, § 667.5, subd. (a).) If either the current offense or the prior

35

offense was not a violent felony, it provides for a one-year enhancement. (Pen. Code, § 667.5, subd. (b).)

Accordingly, Penal Code section 667.5, subdivision (c) (subdivision (c)) defines "violent felony." That definition includes a "[l]ewd or lascivious act as defined in subdivision (a) or (b) of Section 288." (Pen. Code, § 667.5, subd. (c)(6).)

Penal Code section 667.5, subdivision (f) (subdivision (f)), however, also provides, "A prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law *if the defendant served one year or more in prison for the offense in the other jurisdiction*." (Italics added.)

The father therefore argues that a foreign prior is not a violent felony within the meaning of subdivision (b)(12) unless the parent served a year or more in prison on the conviction. In his case, the Kentucky offense was a misdemeanor (Ky. Rev. Stats., former § 510.120, subd. (2)), and he served only 28 days in jail.

However, while subdivision (b)(12) specifically refers to and borrows subdivision (c), it does not mention subdivision (f). And this makes sense. For purposes of a prior prison term enhancement, what matters is the *actual* service of a *felony* term. By contrast, for purposes of the denial of reunification services, what matters is the underlying criminal *conduct*; the *punishment* imposed is irrelevant. Significantly, other statutes that are similarly triggered by particular California felonies are also triggered by any foreign crime that has the same elements, without regard to the punishment imposed.

36

(E.g., Pen. Code, §§ 667, subd. (d)(2), 667.51, subd. (b), 667.6, subd. (e)(10), 667.61, subd. (d)(1), 667.71, subd. (c)(13).)

It could be argued that, if subdivision (b)(12) borrows only subdivision (c) and not subdivision (f), then it does not apply to foreign convictions at all.  For the following reasons, however, we conclude that subdivision (c), all by itself, includes both California and foreign convictions.

In defining violent felonies, subdivision (c) takes a mix of different approaches. In some instances, it simply specifies a common-law felony.  For example, subdivision (c)(1) lists "[m]urder or voluntary manslaughter"; subdivision (c)(9) lists "[a]ny robbery."  Presumably these would include both in-state and foreign convictions. (*People v. Perry* (1962) 204 Cal.App.2d 201, 204 [Pen. Code, § 666, defining petty theft with a prior, applies where prior theft conviction was out-of-state].)

In other instances, it specifies a felony "as defined in" a certain Penal Code section.  For example, in this case, we are dealing with subdivision (c)(6), which lists a "[l]ewd or lascivious act as defined in subdivision (a) or (b) of Section 288."  Although the question is more subtle, this appears to include both in-state and foreign convictions; a lewd act committed out-of-state is still a lewd act *as defined* by California law, even though not *punishable under* California law.

In still other instances, however, subdivision (c) specifies a felony "in violation of" a certain Penal Code section.  For example, subdivision (c)(10) lists "[a]rson, in violation of subdivision (a) or (b) of Section 451"; subdivision (c)(16) lists "[c]ontinuous

37

sexual abuse of a child, in violation of Section 288.5." This is ambiguous. It could be strictly construed to require that the prior must have been committed within California's territorial jurisdiction (see Pen. Code, § 777 et seq.), so as to violate the cited statute. Alternatively, however, it could be more broadly construed to require that the conduct underlying the prior *would have violated* the cited statute, *if* committed in California.

It would be absurd to suppose that the Legislature intended these minor differences in wording to make a substantive difference with regard to the effect of a foreign prior. It must be remembered that subdivision (c), when originally drafted, did not need to be very precise in specifying its territorial reach, because subdivision (f) went on to provide that "[a] prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law *if the defendant served one year or more in prison for the offense in the other jurisdiction*." (Italics added.) In other words, even under Penal Code section 667.5, as originally drafted, subdivision (c) included both in-state and foreign convictions; subdivision (f) then served as a *limitation* on the inclusion of foreign convictions, so that they were included only if the defendant served at least a year in prison.

Later, when subdivision (b)(12) was enacted, the Legislature borrowed subdivision (c) as a list of the types of prior convictions that would disqualify a parent from reunification services, despite the handful of sub-subdivisions that used the ambiguous "in violation of" wording. At the same time, it declined to borrow

38

subdivision (f), indicating its intent that the service of a prior prison term of a year or more should be irrelevant to reunification services. Accordingly, subdivision (b)(12) encompasses foreign convictions, without regard to whether the defendant served a year or more in prison.

We find support for our conclusion in *People v. Hazelton* (1996) 14 Cal.4th 101, which dealt with Penal Code section 1170.12, the initiative version of the three strikes law. Penal Code section 1170.12, subdivision (b) "defin[ed] a 'prior conviction of a felony' as [including both]: '(1) Any offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7 as a serious felony in this state'; [and] '(2) A conviction in another jurisdiction for an offense that, if committed in California, is punishable by imprisonment in the state prison [and] . . . includes all of the elements of the particular felony as defined in subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7' . . . .'" (*Hazelton*, *supra*, at p. 105.) However, Penal Code section 1170.12, subdivision (c)(2)(A) (subdivision (c)(2)(A)) provided that third-strike penalties applied to "a defendant who has 'two or more prior felony convictions, *as defined in paragraph (1) of subdivision (b)* . . . .'" (*Ibid*.) The defendant therefore argued that a foreign serious or violent felony conviction did not count as a strike for third-strike purposes. (*Ibid*.)

The Supreme Court observed that subdivision (c)(2)(A) was ambiguous: "[T]he phrase 'prior felony convictions, as defined in paragraph (1) of subdivision (b),' could be interpreted, as defendant suggests, to refer to the *forum* in which the prior conviction was

39

obtained, i.e., an adult criminal proceeding in California. This interpretation would, of course, mean that out-of-state convictions, which are described in subdivision (b)(2), would not qualify for subdivision (c)(2)(A)'s third strike penalty. [¶] Alternatively, the same phrase could be interpreted as highlighting the *nature* of the prior conviction, i.e., a violent or serious felony, that will qualify as a prior felony conviction in a three strikes case. Because section 1170.12, subdivision (b)(2), includes only those out-of-state convictions deemed violent or serious in California, interpreting subdivision (c)(2)(A) to refer to the nature of the former conviction would mean that out-of-state convictions would qualify for the subdivision's third strike penalty." (*People v. Hazelton*, *supra*, 14 Cal.4th at pp. 105-106.) The court went on to conclude that the ambiguity should be construed in accordance with indicia that the voters intended out-of-state convictions to be strikes for third-strike purposes. (*Id.* at pp. 107-108.)

In sum, *Hazelton*, like this case, involved a statute that borrowed subdivision (c) but failed to borrow language specifically including foreign convictions. The court nevertheless held that that statute was ambiguous, and that its reference to subdivision (c) was intended to encompass *all* prior convictions of the *nature* specified in subdivision (c), regardless of whether they were in-state or foreign. For similar reasons, we come to the same conclusion here.

In a single sentence, the father also argues that there was insufficient evidence that the Kentucky conviction included all of the elements of a lewd act in violation of Penal Code section 288, subdivision (a) or (b). We deem this argument forfeited, "since it is

40

not stated under a separate heading, is not sufficiently developed, and is unsupported by citation to authority. [Citations.]" (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12.)[9]

We therefore conclude that there was sufficient evidence to support the denial of reunification services under subdivision (b)(12). We therefore need not consider whether there was also sufficient evidence to support the denial of reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(16).

## VII

## LACK OF NOTICE OF THE GROUNDS FOR DENYING REUNIFICATION SERVICES

The father contends that the juvenile court could not deny him reunification services based in any way on his 1997 Kentucky conviction, because the petitions did not allege that conviction as grounds for jurisdiction.

The father relies on *In re Rodger H.* (1991) 228 Cal.App.3d 1174, which stated that "a supplemental or 'subsequent' petition is required . . . where a dispositional order

---

**9** At oral argument, the father's counsel asserted that the California statute requires a specific intent that the Kentucky statute does not.

Under California law, a lewd act "requires 'the *specific intent* of arousing, appealing to, or gratifying the lust of the child or the accused.' [Citation.]" (People v. Warner (2006) 39 Cal.4th 548, 557.) As already mentioned, under Kentucky law, second degree sexual abuse requires "the purpose of gratifying the sexual desire of either party . . . ." (Ky. Rev. Stats., former § 510.010, subd. (7).) Thus, it appears that anyone who has the specific intent required by the Kentucky statute also has the specific intent required by the California statute.

removing a child from parental custody may be premised upon 'completely new' conduct or circumstances that are wholly unrelated to the conduct or circumstances alleged in the sustained petition. Conversely, where the conduct or circumstances shown at the disposition hearing tend to explain the conduct or circumstances alleged in the sustained petition, the conduct or circumstances are not 'new' and no new petition need be filed. Due process is satisfied if the child is removed from parental custody on the basis of the same ultimate fact(s) as have been alleged in a sustained petition." (*Id*. at pp. 1182-1183.)

Preliminarily, the father forfeited this contention by failing to object based on lack of notice below. "[A] party waives all jurisdictional objections to a proceeding, including lack of notice, by opposing or resisting the proceeding on its merits. [Citations.]" (*In re Gilberto M*. (1992) 6 Cal.App.4th 1194, 1200.) Even a lack of notice that would otherwise be a due process violation can be forfeited by failure to raise it in the trial court, provided there has been an opportunity to do so. (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060; *In re Cynthia C*. (1997) 58 Cal.App.4th 1479, 1491.)

Turning to the merits, *Rodger H.* dealt with notice of the *grounds for removal*. The father cites no authority for the proposition that the petition must also give notice of the *grounds for the denial of reunification services*. Ordinarily, the social worker's report that includes the recommendation that reunification services be denied constitutes sufficient notice for purposes of due process. (See *In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1141.) Admittedly, here, the Department was recommending that the

father *receive* reunification services. Minors' counsel, however, disagreed. At a hearing on April 25, 2013, she declared: "I would like to advise the Court and parties I am going to be asking for no F[amily] R[eunification] for [the father] based on his registered sex offender status." She asked that the matter be set as contested. This was more than ample notice of the issues to be litigated at the jurisdictional/dispositional hearing on June 3, 2013.

In any event, the petitions themselves also provided the father with sufficient notice. They alleged that the juvenile court had jurisdiction because, among other things, "[t]he mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a history of sexually offending minors [*sic*] . . . ." This necessarily meant that, because of the father's history of sexually offending against minors, it would be detrimental for *anyone* to leave the children in his care — not only the mother, but also the juvenile court. In light of this allegation, the father had to know that he would have to litigate the impact of his prior conviction on his ability to care for the children.

## VIII

## THE SUFFICIENCY OF THE EVIDENCE THAT REUNIFICATION

## WITH THE FATHER WAS NOT IN THE BEST INTEREST OF THE CHILDREN

The father contends that the juvenile court erred by finding that reunification was not in the best interest of the children.

When a parent is not entitled to reunification services under specified subdivisions of Welfare and Institutions Code section 361.5, subdivision (b), including subdivisions (b)(12) and (b)(16), the juvenile court may nevertheless order reunification services if it "finds, by clear and convincing evidence, that reunification is in the best interest of the child." (Welf. & Inst. Code, § 361.5, subd. (c).)

"'A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion.' [Citation.]" (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164-1165.) Because the father had the burden of proof, we must affirm unless there was "indisputable evidence [in his favor] — evidence no reasonable trier of fact could have rejected . . . ." (*In re Sheila B*. (1993) 19 Cal.App.4th 187, 200.)

The juvenile court relied on the father's "significant criminal history." As the court noted, this was not limited to the 1997 Kentucky conviction; it also included a charge involving methamphetamine manufacturing, as well as a charge involving personal use of a controlled substance. Recently, in 2012, he had been incarcerated (and thus out of the children's lives) for eight months. It noted that "he spent a great deal of time denying the underlying facts" of his 1997 Kentucky conviction. It concluded that he lacked "insight, not just about the sexual conviction but . . . about remaining law abiding . . . ." Significantly, he also denied and minimized the history of domestic violence that the mother freely admitted.

44

In light of the father's recidivist criminal history, including drug and firearm-related crimes, the juvenile court could reasonably conclude that he had not proven that reunification with him would be in the best interest of the children. Admittedly, the social worker did testify, "[T]he boys love him. The boys are bonded with him." However, they had been separated from him during his eight-month incarceration, with no apparent ill effects. Similarly, there was evidence that, after the removal, N.S. sometimes woke up crying for the mother, but there was no such evidence that the children missed the father.

"Although we may have not made the same decision . . . , on this record we cannot conclude that the juvenile court abused its considerable discretion . . . . [Citation.]" (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 131.)

IX

DISPOSITION

The true finding on allegation B-3 in both petitions is modified as follows. (See *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 771.)

The following portion of the allegation is found not true:

"The mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a history of sexually offending minors [*sic*] . . . , . . . which place[s] the child[] . . . at a significant and substantial risk o[f] harm and/or death."

45

The following portion of the allegation is still found true:

"The mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a . . . history of violent assaultive behavior, history of anger management issues, history of drug deals, all of which place the child[] . . . at a significant and substantial risk o[f] harm and/or death."

The orders appealed from are affirmed as modified.

CERTIFIED FOR PARTIAL PUBLICATION

RICHLI
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.

46