Filed 2/29/16  In re U.B. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re U.B. et al., Persons Coming Under the Juvenile Court Law. | C078608 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff and Respondent, v. CASSANDRA B., Defendant and Appellant. | (Super. Ct. Nos. JD235124, JD235125, JD235126) |

Mother, Cassandra B., appeals from the juvenile court's judgment removing her three children from her custody, placing them with their respective fathers, and terminating the dependency.  (Welf. & Inst. Code, §§ 300, subds. (a), (b), 361.2.)[1]  She argues there was insufficient evidence of substantial danger to the children at the time of

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

the disposition order, and the juvenile court failed to consider other reasonable means to protect the children without removal from mother.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and her boyfriend, Brian W., had had a stormy on-and-off relationship for two years prior to the dependency petition.  Their relationship was marked by three Child Protective Services (CPS) referrals, at least nine calls to law enforcement, and many instances of domestic violence—including hitting, choking, and pepper spraying. Mother's children—two-year-old U.B., eight-year-old William A., and 10-year-old M.A.—were present for many fights, which began shortly after the boyfriend moved in, in October 2012.

### *Prior instances of domestic violence*

From 2012 to 2014, police responded to many domestic violence calls from mother.  In one instance, in August 2013, mother had wanted the boyfriend to leave.  He refused, and mother pepper sprayed his face.  He retaliated by pushing her down and choking her.  She then hit him in the face several times.  When police arrived, mother told them the boyfriend had been " 'physical with her' " on multiple occasions.

Another time, in December 2013, mother called 911 because the boyfriend choked her to the point of losing consciousness and control of her bladder.  The boyfriend also tore a phone from the wall, threw a chair, broke a window, and trashed the house—all while the children were home.  The boyfriend tried to stop mother from calling 911, and she locked herself in the bathroom to call for help.  At the emergency room, mother said the boyfriend chokes her and " 'does this kind of thing' " every week or two.  He had also threatened to kill her.  But when a social worker followed up on the incident, mother denied any violence, saying she went to the emergency room because she did not feel well and had a headache.  That interview was later terminated after mother yelled, got out of her chair, and slammed the door.

The children were often present during the violence. The daughter M.A., the eldest and only verbal child, recalled the choking incident. She was in the bathroom when mother and the boyfriend began arguing and throwing things. The daughter brought the middle child (who was autistic) from the living room, to her room. When she went back for her youngest sibling, she saw her mother lying on the floor. Mother told her to call 911—but the boyfriend said " 'no, stay in your room.' " Mother later made her daughter " 'pinky promise' " not to tell anyone about the incident. This was one of several instances of the daughter protecting her younger brothers from the fighting. The daughter recalled her old home had many holes in the walls from fighting and arguing.

The daughter also explained that mother and her boyfriend were " 'always arguing and using bad words, so my two year old brother is using bad words all the time.' " The youngest child was also "kicked out" of daycare for biting. The biting later subsided when he was sent to live with his father.

### The freeway incident

The incident that led to the dependency petition occurred mid-August 2014. Mother was driving the boyfriend, with the two younger children in the car. While on the freeway, the boyfriend hit mother in the face. Mother then drove to a gas station and called the police. The officers arrested the boyfriend. The officers provided information on domestic violence and offered an emergency protective order, but mother declined. Mother would later testify that the argument began because she was trying to end the relationship. Ending the relationship was the "reason for all of the arguments."

Four days later, a social worker met with mother, who said the incident was only verbal: She called the police after the boyfriend left with her car keys while they were parked in a red zone. She also said she was fully willing to comply with any request and would not have any issue participating in services. The social worker told mother that

3

she did not want the boyfriend around the children or in the house while the investigation was being conducted.

The next day, the boyfriend was seen taking the children to school. A social worker called mother about that contact. Mother responded that the boyfriend was her daycare provider, and she only agreed to keep the boyfriend from her house, not from her children. When asked why she did not disclose that the boyfriend was providing daycare, mother responded that she had not been asked, and added that she had not received anything in writing from the social worker. Mother later said she made a " 'judgment call' " to allow the boyfriend to take the children to school because she did not have anyone else.

The boyfriend continued to have contact with the children in the days leading up to the initial hearing. He took them to the gym. He took the daughter to a Tae Kwon Do tournament and a basketball game. He was with them at a Tae Kwon Do practice. And he was seen at mother's house and drove her to the initial hearing.

The dependency petitions were filed on September 2, 2014, seventeen days after the freeway incident. Two days later, mother filed for a restraining order against the boyfriend. On the form, she did not request that the stay-away order apply to her, nor did she request that the boyfriend have no contact including by phone or e-mail. She did, however, seek a 50-yard stay-away order applying to the children, their school, and her home. Where the form asked for the second and third most recent incident of abuse she wrote, "N/A." Where it asked her to describe "other abuse against you or your children," she wrote "None."

At the initial hearing, the court detained the children from mother and ordered them placed in their respective fathers' care.

After the initial hearing, the boyfriend wrote several messages responding to mother's Facebook postings. He twice reposted mother's moving sale announcement. And in response to mother's post about "[l]earning to say goodbye to people or things in life that are divisive," the boyfriend wrote, "Hey babe. Don't take me off the list. I'll start taking more baths or showers and I will not leave toe nails in the bed too." The message included an emoticon smiling face with a halo. Mother later testified that she did not invite his comment, and she believed he had been blocked. She had, however, e-mailed the boyfriend telling him to move his belongings from her house.

*Jurisdiction and disposition hearing*

The jurisdiction and disposition hearing began in late November 2014. During the hearing, mother testified that she had broken up with the boyfriend before the freeway incident, and he moved out in early October when she moved in with the maternal grandmother. The maternal grandmother testified that she did not approve of the boyfriend. The maternal grandmother also testified that she had suggested counseling to mother, but admitted she did not have any further discussion with mother about taking steps to protect herself because she did not have control of that.

At the hearing's conclusion, the juvenile court held that the department had met its burden, finding a pattern and history of serious domestic violence in front of the children and a substantial risk that the endangering behavior would recur. The court noted mother had a history of exposing the children to domestic violence by maintaining the relationship with her boyfriend and keeping him as respite care provider, after learning of his propensity for violence. And mother had also been an aggressor, pepper spraying the boyfriend and leaving him with visible injuries—with the children present.

The court noted the daughter (the only verbal child) felt unsafe in the home, and that mother was dismissive of those fears. Mother minimized the severity and extent of the domestic violence, or simply did not recognize it. She refused to listen to options to

protect herself or her children and had refused the department's offer of informal services, from September 2013 to February 2014.

The court also found mother not credible. The court cited many instances of documented abuse that mother later denied, including telling the social worker the freeway incident was only verbal. At the hearing, mother's demeanor was guarded. She evaded questions and at times appeared to deliberately forget questions. Her memory was spotty—sometimes conveniently so. The court found there were too many inconsistent, recanted, or unrecalled statements as to material issues.

The court also found mother was in the very early phases of learning about domestic violence and its effects. She had minimized serious incidents and did not appear to recognize the risk and effects the violence had on her or her children. She chose to attend parenting classes over domestic violence counseling. And she had obtained a restraining order but delayed seeking it, and her attitude toward the order gave little confidence that she valued the power and protection it could provide her. The court called mother's approach coerced participation rather than genuine recognition of her family's need for services and protection. Moreover, the Facebook posts showed the boyfriend was still interested; thus, he might continue to pursue her, and in the past she had relented.

While the court found moving in with the grandmother afforded some safety, the grandmother was not supportive in the past. The grandmother was reluctant to get involved in her daughter's personal business and knew little of the domestic violence or matters going on in the household—and had her hands full caring for a terminally ill father. Thus, the court did not find a basis to believe that the risk had been reduced.

Finding the father of the youngest child and the father of the two older children capable and willing to assume custody, the court gave custody to the respective fathers, ordered visitation for mother, and terminated dependency.

**DISCUSSION**

On appeal, mother contends that (1) at the time of the disposition orders, there was insufficient evidence of a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being, and (2) the juvenile court failed to consider other reasonable means to protect the children without removal from mother. We disagree.

When the sufficiency of the evidence to support a finding or order is challenged on appeal (even where the standard of proof in the trial court is clear and convincing), we must determine if there is substantial evidence—that is, evidence which is reasonable, credible, and of solid value—to support the conclusion. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 (*Angelia P.*); *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) In making this determination, we draw all reasonable evidentiary inferences and resolve all conflicts in favor of the prevailing party. (*Jason L.*, at p. 1214.) Issues of fact and credibility are questions for the trier of fact. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

### I. Substantial Evidence Supports the Juvenile Court's Finding of a Substantial Danger to the Children

Mother challenges the sufficiency of evidence arguing that, at the time of the hearing, she appeared to have broken up with the boyfriend, she had obtained a restraining order against him, and the boyfriend was no longer living with her. Moreover, there was little evidence that she was maintaining contact with him: the only contact being her message to him, asking him to remove his belongings from her apartment, and his Facebook posts, to which there was no evidence that she solicited or responded to the posts. This contention has no merit.

A child shall not be taken from the parents' physical custody absent a showing by clear and convincing evidence that "[t]here is or would be a substantial danger to the

7

physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home . . . ." (§ 361, subd. (c)(1).) In considering the circumstances at the time of the hearing, " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S. O.* (2002) 103 Cal.App.4th 453, 461.)

The juvenile court found mother's testimony unreliable. That finding was well supported by mother's pattern of reporting, then denying, domestic violence instances; her pattern of deception regarding her relationship with the boyfriend and his role as caretaker for the children; and her evasive and highly selective testimony at the hearing.

Having found mother unreliable, her assertion that the risk had abated carried little weight. And cutting against that assertion was a long-standing pattern of past conduct, highly probative of current conditions. Mother had many times continued the relationship with the boyfriend (including allowing him to care for the children) after serious domestic violence instances—indeed the Facebook post suggested the boyfriend wished to reunify. Mother had repeatedly minimized or recanted serious domestic violence instances. She had shown little interest in assistance. She had refused informal services, misled social workers, and leading up to the hearing, she prioritized parenting classes over domestic violence counseling. When she finally sought a restraining order, her approach to it gave little confidence she would seek to enforce it.

We find substantial evidence supporting the juvenile court's finding.[2] (See *Angelia P.*, *supra*, 28 Cal.3d at p. 924.)

---

[2] Mother further relies on *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171, which held that two incidents of domestic violence afforded insufficient evidence to support removal, because "neither incident directly affected either minor physically . . . ." This point is not well taken. When *Basilio T.* was decided, former section 361, subdivision (b)(1) covered only "a substantial danger to the physical health of the minor" not—as it does now—"a substantial danger to the physical health, safety, protection, or physical or emotional

## II.  The Juvenile Court Did Not Fail to Consider Other Reasonable Means to Protect the Children Without Removal

Mother next contends the juvenile court failed to consider other reasonable means to protect the children without removal.  She argues the children could have been adequately protected with family maintenance services.  Mother was living with the grandmother, who testified she did not approve of the boyfriend.  And mother had broken up with the boyfriend and obtained a restraining order against him.  Thus, the court could have ordered that she abide by the restraining order and that there be no contact with the boyfriend.  Additionally, the court could have ordered unannounced visits by the social worker.  This contention too has no merit.

In addition to finding a substantial danger if the minors were returned home, the juvenile court must also find that "there are no reasonable means by which the minor[s'] physical health can be protected without removing the minor[s] from the minor[s'] parent's . . . physical custody."  (§ 361, subd. (c)(1).)

As explained, the juvenile court's credibility finding gives mother's assertion that she had ended the relationship with the boyfriend little persuasive value.  And moving in with the grandmother would do little to mitigate the risk to the children.  The grandmother had shown either limited interest or limited ability to get involved in the domestic violence problems.  And having the children at the grandmother's would not prevent contact at the gym, Tae Kwon Do, and other places both the children and the boyfriend frequent.  Unannounced social worker visits would be similarly ineffective.

Moreover, mother's repeated failure to abide by social workers' directions that the children have no contact with the boyfriend, and the fact that she was only in the very

---

well-being of the minor . . . ."  (§ 361, subd. (c)(1).)  Here, the ongoing domestic violence, in the children's presence—at a minimum—created a substantial danger to the children's emotional well-being.  (See *In re J.S.* (2014) 228 Cal.App.4th 1483, 1493-1494 [distinguishing *In re Basilio T.*].)

9

early stages of understanding the risk to her children, further suggested that letting the children continue to live with her was not a viable option. Thus, the juvenile court's finding that there were no other reasonable means to protect the children without removal was supported by substantial evidence. (See *Angelia P.*, *supra*, 28 Cal.3d at p. 924.)

## DISPOSITION

The dispositional orders are affirmed.


       BUTZ       , Acting P. J.


We concur:


     MAURO     , J.


     HOCH     , J.

10