Filed 9/16/20  In re R.M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re R.M. et al., Persons Coming Under the Juvenile Court Law. | B303436 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. U.M., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19LJJP00645A-B) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephanie M. Davis, Judge Pro Tempore. Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————————

Father U.M. (Father) appeals the jurisdictional findings and dispositional orders of the juvenile court concerning his dependent children, R.M. and Ryder M. He contends 1) the evidence was insufficient to support the court's findings on the jurisdictional allegations of the dependency petition; 2) the court erred when it removed the children from his custody; and 3) the court should have granted him unmonitored, rather than monitored, visitation. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

I. **Initial Investigation and Commencement of Proceedings**

The family, consisting of Father, R.A. (Mother), R.M. (born 2016), and Ryder M. (born 2018), came to the attention of the Department of Children and Family Services (DCFS) after a bystander called 911 in July 2019 to report witnessing domestic violence by Father against Mother at a park. The 911 caller reported Father had shouted at Mother so loudly that it was audible inside the caller's home across the street from the park. Father yelled, "Don't disrespect me in front of my kids!" The caller looked out his window and saw Father holding Mother by the hair, yelling at her, and pushing her into the backseat of a car. The children were standing next to Mother when this occurred. The 911 caller identified Father when the police arrived.

Mother and Father gave the police similar accounts of what had happened. Father said he and Mother had been "play fighting." He had picked Mother up over his shoulder, spun her around, and placed her back on the ground, and he also threw water from a water bottle on her. Mother told the police she and

2

Father had been "play fighting," "just wrestling," in the car and on the sidewalk. She described Father placing her over his shoulder and spinning her around in the air before setting her down. Mother said he threw water on her because she complained it was hot.

The police noticed Mother's hair was "disheveled"; it "appeared as though someone grabbed the victim's hair and attempted to violent[ly] pull her hair out." The police concluded domestic violence had occurred and arrested Father. Mother declined an emergency protective order.

A DCFS social worker interviewed Mother on August 9, 2019. Initially, Mother denied domestic violence and said she and Father were merely "horse playing" at the park. Mother changed her account once she learned two-and-one-half-year-old R.M. had told the social worker that Father went to jail because he slapped Mother's face. She told DCFS Father slapped her face and threw water on her during an argument. She cried, not because of the slap, but from embarrassment. Mother denied Father had said anything about disrespecting him in front of the children, and she explained her hair was messy because she had not styled it that day. She told the social worker this was the first time Father had hit her. Although she felt a restraining order was unnecessary, Mother was willing to seek one if she needed to do so.

Mother and the children lived in the home of the maternal great-grandmother. The maternal great-grandmother told DCFS Father used to live in the home as well, but she had asked him to leave because he and Mother argued too much. She had never seen any violence between Mother and Father. They were good parents despite their frequent arguments. The maternal great-

3

grandmother said she had heard "different stories" about what had happened in the park, and she did not know who was telling the truth.

Five-year-old C.J.,[1] Mother's child from a prior relationship, told DCFS he had never witnessed fighting or violence between Mother and Father. C.J. liked Father, who took him on outings.

The social worker interviewed Father on August 13, 2019. Father claimed not to know why he was arrested. He said he and Mother had been together for five years, and he would never do anything to hurt her in front of the children. He denied slapping Mother, pushing her, or pulling her hair. He admitted he had picked Mother up by the waist "in a sexual way" and put water on her, and she had playfully screamed; Father believed the 911 caller had misinterpreted the incident.

DCFS spoke with Mother again at the end of August. She said Father visited the children every few days. Mother was unwilling to obtain a restraining order against Father, but she would protect the children from him, and she would comply with court orders if a dependency case were filed.

On September 4, 2019, DCFS advised the parents it had obtained a court order removing the children from Father. The children were released to Mother. Mother agreed to DCFS's recommendation that she attend a domestic violence class for victims and a parenting education course. Father, who reported he was now homeless and living out of town, told DCFS he loved

---

[1]     C.J. was not present for the incident in the park, and he was not a subject of the dependency proceedings.

his children, they were the only family he had, and he would never harm them. Father said he would do anything for his children, and he agreed to take domestic violence and parenting education classes as recommended by DCFS. That day, Father took a four-hour domestic violence course and enrolled in an eight-hour domestic violence class. He enrolled the next day in a four-hour parent education and family stabilization course.

On September 6, 2019, DCFS filed a dependency petition alleging R.M. and Ryder M. came within the jurisdiction of the juvenile court under Welfare and Institutions Code[2] section 300, subdivisions (a) (physical abuse) and (b)(1) (general neglect). Under both subdivisions, DCFS alleged Mother and Father "have a history of engaging in violent physical and verbal altercations in the presence of the children. On 07/31/2019 [Father] slapped the mother's face[,] grabbed and held the mother by the mother's hair, spun the mother around in the air, pushed the mother into a vehicle[,] and threw water on the mother, in the children's presence. On 07/31/2019 the father was arrested for [b]attery on a[n intimate partner]. Such violent conduct of the father against the mother in the presence of the children endangers the children's physical health and safety, placing the children at risk of suffering serious physical harm, damage and danger."

The children were detained from Father and remained with Mother. Father was granted monitored visitation three times a week for three hours per visit.

---

[2] All further undesignated statutory references are to the Welfare and Institutions Code.

5

## II.  Report for the Jurisdictional/Dispositional Hearing

In October 2019, DCFS re-interviewed Mother, Father, and the maternal great-grandmother in advance of the jurisdictional hearing.  Father now denied the incident ever occurred:  All he had done was pick Mother up and give her a kiss.  Father told DCFS, "I never put my hands on my baby momma.  I never threw water on the mother.  My son was right next to her in the car.  If I did that I would have thrown water on my son.  I don't know how you take custody of my kids when I'm a better parent than the mother.  How can you take my custody of my kids when my step-son says I'm a good father?"  He said he and Mother had not been play fighting at the park.  He denied pulling Mother's hair or spinning her around; in fact, he claimed, it was impossible for him to have done so because Mother was in the car the entire time.  Father said what the police thought was disheveled hair was actually Mother's natural hairstyle as a Black woman.

Father claimed Mother had said he had been violent because she thought DCFS was going to take the children away from her.  He maintained he was a better parent than Mother, and DCFS erred in removing the children from him because he did more for them than she did.  Father told DCFS he provided money for the children but he did not know what happened to it, and it did not appear Mother spent it on the children.  Father said, "She don't [*sic*] do the things she is supposed to.  She will leave the kids with people.  All I'm saying is that I'm a better parent.  I just want to make sure the money she gets goes to the kids.  You should make sure she brings receipts."

Father also told DCFS he had moved to Nevada to make a better life for himself and his family.  He declined to provide

DCFS with any information regarding his family history because he felt DCFS was only trying to "build a case" against him.

In her interview, Mother told DCFS she and Father had a disagreement at the park, but it had never escalated into yelling or a physical altercation. He did not hit her; he simply grabbed her face with his hand during their argument and turned her face to make her look at him. She was not injured. Mother said Father poured water on her because she was upset and crying, and he was trying to cheer her up. She acknowledged her previous report that Father had slapped her, but explained she made up what she thought the social worker wanted to hear because the social worker said she would take the children away if Mother did not tell the truth.

The maternal great-grandmother confirmed she had never seen a physical altercation between Mother and Father, nor had she ever observed any sign of injuries to Mother. She had, however, witnessed many arguments between the parents: these arguments usually involved Father trying to "control" Mother when she wanted to go out socially and Father preferred she stay home. Father was ready to settle down, the maternal great-grandmother reported, but Mother was not. The maternal great-grandmother had found it necessary to tell the parents to "knock off the fighting," and they always complied.

The maternal great-grandmother believed the dependency case was unnecessary and DCFS had inflated a minor incident into a larger issue. Father was an excellent, active, and involved parent: He watched the children, cooked for them, bathed them, did their hair, and cleaned up after them. Father's strong drive to be a good father and his preference that Mother stay home arose from his desire to give his children a better childhood than

his own. The maternal great-grandmother felt the dependency proceedings had driven Father out of the children's lives.

DCFS also spoke with the maternal aunt, who agreed with the maternal great-grandmother's assessment: Father was a great father who cared deeply for his children. She would trust her own children with him and believed he would never harm a child.

DCFS recommended the juvenile court exercise dependency jurisdiction over the children. The available information confirmed the allegations of the dependency petition, and although she had subsequently recanted, Mother had confirmed to DCFS that Father slapped her and threw water on her in front of the children. Both parents had changed their stories over time, leading DCFS to believe they had "demonstrated a lack of honesty." DCFS stated that Mother and Father "have yet to provide a full and accurate account of what happened on 07/31/2019 and continue to deny and minimize in an effort to avoid any consequences for their actions." DCFS found it "uncertain" whether the incident was truly the first incident of domestic violence; while Mother and Father denied prior violence and there were no earlier police reports, Father was reported to be controlling and had been extremely violent during the park incident, "which is uncommon for a first[-]time incident" of domestic violence. Mother had not demonstrated she would protect the children absent juvenile court involvement, as she allowed ongoing unmonitored contact with the children and "only began acting protective when DCFS became involved with the family." DCFS believed both parents would benefit from domestic violence classes and parenting education.

8

### III.   Jurisdictional and Dispositional Hearing

The jurisdictional and dispositional hearing took place on October 21, 2019.  The juvenile court admitted into evidence DCFS's reports, Father's certificate of enrollment and a course description for an upcoming parenting course in Nevada, and a pay stub from Father's job.  No other evidence was presented. Father's counsel asked the court to dismiss the petition in its entirety, arguing DCFS had not met its burden to prove a current substantial risk of harm to the children.  DCFS, Father's counsel argued, was asking the court to "fill in the holes and craft a nexus of current risk of harm to these children" from a mere argument in a park.  She noted Father now lived and worked in another state; and he had, on his own initiative, located and enrolled in a parenting course in his new city to address the issues raised in the petition.

Mother's counsel also asked the court to dismiss the petition because both parents denied domestic violence and there was no prior history of violence.  "Not every case has to come to court," she argued, and here there was nothing "substantial that's current to justify [DCFS] even asking for supervision in this case."

Counsel for the children asked the court to sustain the failure to protect allegation under section 300, subdivision (b) because the evidence established Father had committed domestic violence.  When assessing the risk to the children posed by the incident, she argued, it was significant that the children were not only in the parents' immediate presence during the altercation, but also they were "integral to the argument that led to" the violence, as evidenced by Father's statement to Mother about disrespecting him in front of the children.  Counsel argued the

9

altercation appeared to be an escalation of ongoing conflict between the parents, who previously had to be told to "knock off" their fighting.

Counsel for DCFS argued the petition's allegations should be sustained: A neutral bystander saw the physical altercation, and Mother's hair was disheveled, consistent with the report that Father had pulled her hair. The parents' accounts of the events were inconsistent, especially as to the water throwing. Counsel argued, "Finally, the father says, well, we were in the car the whole time so none of that ever happened. The only thing he ever did was pick her up and give her a kiss. [¶] Now, if the father is at one point saying he stayed in the car and never did anything, then I don't see how he's able to also say he picked Mother up while he was in the car and gave her a kiss." Father may have enrolled in some short courses, counsel for DCFS noted, but when interviewed he was not forthcoming with information and focused on Mother's parenting to shift the blame away from himself. In light of the evidence from the 911 caller and the police, and because "there's been no showing o[f] either parent taking full responsibility for this and the risk" to which the children had been subjected, DCFS advocated that the petition be sustained.

The juvenile court commented, "The parents' accounts of what happened changed with each interview, and the explanations provided by the Father do not appear to be logical or consistent and are not consistent in any way with the observations of the observer who called 911 based on what that person had observed, and that person was consistent in explaining what was observed." After amending the petition to remove language concerning Father's arrest, the court found the

allegations under section 300, subdivisions (a) and (b)(1) to be true.

With respect to disposition, Father opposed the children's removal of the children from his custody because one domestic violence incident between parents who had no prior DCFS involvement did not constitute clear and convincing evidence that the children needed to be removed from his custody to be protected; and, moreover, Father's move out of state made removal unnecessary. No other party expressed a position on removal.

The court declared R.M. and Ryder M. dependents of the juvenile court, removed them from Father's custody, and placed them in Mother's home. The court ordered Father to attend a domestic violence program for perpetrators and Mother to attend a domestic violence victims' support group. The court also ordered the parents, who were no longer a couple, to undergo conjoint counseling if they reconciled. The court granted Father monitored visitation three times per week for three hours and gave DCFS discretion to liberalize visits. Father appeals.

## DISCUSSION

I.  **Jurisdiction**

We review the juvenile court's jurisdictional and dispositional findings for substantial evidence. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) Substantial evidence is evidence that is " 'reasonable, credible, and of solid value.' " (*In re I.C.* (2018) 4 Cal.5th 869, 892.) Under this standard of review, we examine the full record in the light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses. (*In re*

11

*R.T.* (2017) 3 Cal.5th 622, 633.) We neither reweigh the evidence nor exercise our independent judgment. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146); if so, we must uphold the order even if other evidence supports a contrary conclusion. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

The court took jurisdiction over the children under section 300, subdivisions (a) and (b). When a dependency petition alleges jurisdiction under multiple subdivisions, " 'a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.' " (*In re I.J., supra*, 56 Cal.4th at p. 773.) We proceed with our analysis under section 300, subdivision (b)(1), which authorizes jurisdiction when a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate three elements by a preponderance of the evidence: "(1) neglectful conduct by the parent; (2) causation; and (3) 'serious physical harm or illness' or a 'substantial risk' of serious physical harm or illness." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.)

Children's exposure to domestic violence may support jurisdiction under section 300, subdivision (b)(1). (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 112–113; *In re T.V., supra*, 217 Cal.App.4th at p. 134; *In re E.B.* (2010) 184 Cal.App.4th 568,

12

575–576, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Domestic violence " 'is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' " (*In re E.B.*, at p. 576.) Jurisdiction is therefore appropriate under section 300, subdivision (b)(1), since "[c]hildren can be 'put in a position of physical danger' " from domestic violence because, " 'for example, they could wander into the [area] where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' " (*In re E.B.*, at p. 576.)

To support the exercise of dependency jurisdiction under section 300, subdivision (b)(1), DCFS must provide evidence the domestic violence is "ongoing or likely to continue" and that it "directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717; accord, *In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.) "[T]here 'must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]' [Citation.]" (See *In re D.L.*, *supra*, 22 Cal.App.5th at p. 1146.) "Although 'the question under section 300 is whether circumstances at the time of the [jurisdictional] hearing subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection." (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133, italics omitted.) Moreover, " '[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citations.] The focus of section 300 is on averting harm to the child." (*Ibid.*)

13

The evidence was sufficient to support the exercise of jurisdiction under section 300, subdivision (b)(1).  Father argues "there was no evidence that the children were physically harmed by the parents or ever at risk of enduring physical harm," but the violence by Father against Mother did place the children at risk of physical harm.  The incident took place in front of the very young children and pertained directly to them:  Father was angry about Mother's attitude toward him in front of the children.  Father shouted at Mother, lifted her off the ground and spun her around, seized her by the hair, slapped her, doused her with water, and shoved her into a vehicle.  This violent behavior could easily have resulted in physical injury to the small children nearby.  (*In re E.B.*, *supra*, 184 Cal.App.4th at p. 576 [children may accidentally be harmed during violence between adults].)  Moreover, "[d]omestic violence impacts children even if they are not the ones being physically abused, 'because they see and hear the violence and the screaming.' "  (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 134.)

Father contends there was no evidence "that the violence was ongoing or likely to continue as it never happened before July 2019 or afterwards."  While this incident may have been a first-time escalation from verbal conflict to physical violence, the evidence justified the inference that it was not an isolated event but part of a pattern of significant conflict between the parents.  Father had a history of trying to control Mother, and their conflict and arguments had been so frequent and vocal that the maternal great-grandmother had directed Father to move out of the home.  "A parent's past conduct is a good predictor of future behavior."  (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

14

Father's "lack of honesty," denial of violence, and refusal to take responsibility for his actions also indicated an ongoing risk of harm. In assessing risk, the juvenile court should consider " 'present circumstances [including] evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim . . . that would help a parent avoid a recurrence of such an incident.' " (*In re John M.* (2013) 217 Cal.App.4th 410, 418–419, abrogated on another ground by *In re R.T.* (2017) 3 Cal.5th 622, 627–630.) To be sure, Father voluntarily attended a domestic violence class and enrolled in other courses, but he failed to demonstrate any understanding of his past conduct or acquisition of skills in those programs that would help him refrain from violence in the future. Instead, Father continued to deny his violence, disparaged Mother, and pushed DCFS to investigate Mother's parenting. " '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.) "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

Father, finally, states he had moved to Nevada, apparently to suggest there was no ongoing risk of physical harm to the children. Because Father intended to visit the children in California despite his move, his change of residence does not undermine the juvenile court's findings or suggest there was no longer a risk of harm to the children.

Examining the whole record in a light most favorable to the findings and conclusions of the juvenile court, and deferring to the juvenile court on issues of credibility of the evidence and witnesses, we conclude the record contains sufficient evidence supporting the court's jurisdictional findings under section 300, subdivision (b)(1).

II. **Removal**

Section 361, subdivision (c)(1) authorizes the juvenile court to remove a child from the physical custody of a parent if the court finds, by clear and convincing evidence, there is or would be "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" if the child is returned home, and there are no reasonable means of protecting the minor's physical health without removal from the parent's physical custody. Father argues there was no substantial evidence to support either of these findings. "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.) Applying this standard, we conclude the evidence was sufficient to support the court's findings concerning removal.

A. Substantial Danger to the Children

Substantial evidence supports the juvenile court's finding there would be a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if they remained in Father's custody. As discussed above, the violence, while inflicted upon Mother, happened in the presence of and directly concerned the children. Domestic violence in the presence of the children constitutes "substantial evidence of a substantial danger to the children's emotional well-being, if not their physical well-being." (*In re J.S.* (2014) 228 Cal.App.4th 1483, 1494, disapproved on another ground in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) It was unclear whether this actually was the first incident of domestic violence given its severity, but at a minimum the incident was part of a larger issue of conflict between the parents.

Additionally, Father denied his conduct and attempted to deflect the blame: First, he said the witness misunderstood what he saw. Later, he claimed it was DCFS's fault that Mother said Father slapped her—according to Father, DCFS "scared her" into changing her story. He urged DCFS to investigate Mother's parenting rather than his own. Even at the jurisdictional and dispositional hearing, Father argued it was "unfair" to accept the eyewitness's identification of him. In light of the violence and conflict between the parents and Father's persistent denial and refusal of responsibility, substantial evidence supported the juvenile court's conclusion there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if they were not removed from Father's custody.

17

Father argues the facts here are similar to those in *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171, in which the Court of Appeal ruled the evidence was insufficient to warrant removal of the minors where there had been two incidents of domestic violence that did not "directly affect[] either minor physically." The court stated, "In fact, no evidence whatsoever was presented that the minors were harmed physically during the incidents that led to this proceeding. In sum, we find there was not substantial evidence to uphold a finding under section 361, subdivision (b)(1), under the requisite clear and convincing standard." (*In re Basilio T.*, at p. 171.) Father argues the facts in this case are similar to those in *In re Basilio T.*, and that here, too, his conduct did not rise to the level of an "extreme case of parental abuse or neglect." But the law has changed since *In re Basilio T.* was decided. At the time of *In re Basilio T.*, the removal statute provided that a child could only be removed from parental custody when there was a risk of physical harm to the child. (*Id.* at p. 170.) The types of risk that warranted removal were subsequently expanded by the Legislature. (§ 361, as amended by Stats. 1996, ch. 1084, § 4.) Now a child may be removed from parental custody not only when there is a substantial danger to the physical health of the minor, but also when there there is a substantial danger to the child's safety, protection, or physical or emotional well-being. (§ 361, subd. (c)(1); see *In re J.S.*, *supra*, 228 Cal.App.4th at pp. 1493–1494.) Because of this statutory change, *In re Basilio T.* is no longer helpful in assessing the full range of risks to a child that merit removal.

B.     Reasonable Means Short of Removal

The juvenile court considered less drastic measures than removal and expressly found there were no reasonable means to

18

protect the minors without removal from Father's custody. Father argues the evidence was insufficient to support this finding. He contends the court could have ordered the release of the children to both parents with "an appropriate manner of exchanging the children from one parent to the other," such as prohibiting parental contact in the presence of the children, ordering a relative to exchange the children between the parents, or requiring a relative to be present whenever the children were with both parents. Father suggests that if the court had ordered the parents to undergo domestic violence classes and report to the social worker on their progress, ways that further incidents could be avoided, and safety plans, "there was every reason to believe" the parents would have complied based on their "cooperation" throughout the dependency proceedings.

The evidence supported the juvenile court's determination that dispositions dependent on Father's cooperation were inadequate to protect the children. Father had not been cooperative or forthright with DCFS during the investigation: He gave conflicting descriptions of what had happened, refused to provide information about his family history, and tried to divert DCFS's scrutiny to Mother's parenting and use of funds. There is no basis in the record to conclude Father would have been any more accommodating with dispositional plans requiring supervision by DCFS than he had been with its investigation. Moreover, Father's proposed alternatives to removal are premised on the idea that the children would be in no danger from his violence as long as they did not witness contact between Mother and Father. But given that Father perceived no incongruity in committing a violent attack in front of the children to retaliate for disrespectful conduct in front of them; he was

19

dishonest about his conduct; and he denied all wrongdoing, the evidence supported the juvenile court's conclusion that leaving these very young children in Father's custody, even if Mother was absent, would not have adequately protected them from the threat his violence posed.

A child need not actually be physically harmed before removal is appropriate. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451, disapproved on another ground in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) The goal is to avert any harm befalling the minor child. (*In re Alexzander C.*, at p. 451.) On the record before it, the juvenile court could reasonably have found by clear and convincing evidence that Father posed a substantial danger to the children's physical and emotional well-being and that their physical health could not be protected without their removal from his custody.

III. **Monitored Visitation**

Father contends the juvenile court abused its discretion when it ordered monitored visitation. A juvenile court "may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child" (§ 362, subd. (a)), and it has " 'broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.' " (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.) "We review an order setting visitation terms for abuse of discretion. [Citations.] We will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

Father contends there was no evidence the children's physical or emotional well-being would be jeopardized by unmonitored visitation because he posed no risk to them. According to Father, "there was no history of domestic violence, and Father immediately sought to address the issue through services." However, as we have discussed at length above, the domestic violence here was part of a history of significant conflict between the parents. As commendable as it is that Father sought some services on his own initiative, he did not demonstrate any insight into his conduct, instead continuing to deny he had engaged in violence against Mother and seeking to avoid blame for his conduct. Similarly, Father notes his parenting skills were well-regarded and the court specifically declined to require parenting education for him. But the fact that his parenting skills may otherwise have been excellent does not change Father's history of altercations with Mother or his refusal to accept responsibility for his actions. Finally, Father contends it was "especially clear" that unmonitored visitation posed no risk to the children because he had moved to Nevada, but he does not explain what bearing his state of residence could have on whether visits should be monitored or unmonitored, nor are we aware of any authority suggesting monitors are unnecessary during visits if the parent lives at a distance.

The substantial evidence supporting the court's jurisdictional findings also supports the court's visitation order. The juvenile court did not abuse its discretion in ordering monitored visits for Father.

21

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:


BIGELOW, P. J.


GRIMES, J.