Filed 5/22/23 In re B.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re B.J., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E079603 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J285668) |
| v. | OPINION |
| A.J., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Affirmed.

Neale B. Gold, by appointment of the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

# I. INTRODUCTION

On August 16, 2022, following a hearing pursuant to Welfare and Institutions Code section 387,[1] the juvenile court entered an order removing a dependent minor, B.J., from the physical custody of defendant and appellant A.J. (Mother) and J.B.(Father). Mother appeals from this order, challenging the sufficiency of the evidence to support the juvenile court's findings that: (1) the previous disposition returning B.J. to her custody had been ineffective in rehabilitating or protecting B.J., and (2) B.J. was at substantial risk of harm absent the removal from Mother and Father's custody. We conclude the record contains substantial evidence in support of the juvenile court's findings, and we affirm the order.

# II. FACTS AND PROCEDURAL HISTORY

A. *Procedural History*

B.J. came to the attention of San Bernardino County Children and Family Services (CFS) shortly after his birth. Mother tested positive for marijuana at the time of B.J.'s birth, claimed to have been unaware of her pregnancy, did not have a stable living situation or a source of income, and had a history with child welfare services in the State of Oregon. Initially, Mother and Father consulted with a CFS social worker regarding the possibility of giving B.J. up for adoption, but they decided to seek services and pursue reunification instead.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

On June 24, 2020, CFS filed a juvenile dependency petition on behalf of B.J. pursuant to section 300 et seq., alleging, in part, that: (1) Mother and Father failed to protect B.J. as the result of Mother's substance abuse problem, (2) Mother and Father were unable to provide for B.J.'s basic needs; and (3) Mother abused or neglected one of B.J.'s siblings in Oregon and was unable to reunify with the sibling. The juvenile court sustained these allegations of the petition and ordered B.J. removed from Mother and Father's custody.

In an 18-month review report, CFS recommended that B.J. be returned to his parents' custody and that the dependency action be dismissed. At the time, CFS reported that Mother had consistently tested negative for illicit substances, had obtained steady employment, and had stabilized her living situation. Both Mother and Father completed parenting courses, and Father appeared capable of caring for B.J. while Mother worked. As a result, on December 21, 2021, the juvenile court ordered B.J. be returned to the custody of Mother and Father. However, the juvenile court declined to dismiss the dependency action at that time and, instead, set the matter for further review.

After B.J. was returned to Mother and Father's custody, CFS began reporting a deterioration in their living conditions. As a result, CFS filed a supplemental petition pursuant to section 387, seeking to have B.J. removed and placed into a more restrictive level of placement on the basis that the previous disposition had been ineffective.

B. *Relevant Evidence*

On August 16, 2022, the juvenile court held a contested evidentiary hearing on the section 387 petition. The juvenile court received and accepted into evidence the

3

following reports filed by CFS: (1) an interim review report dated June 20; (2) two additional information reports dated August 16 and June 20; (3) a section 387 detention report; and (4) a jurisdictional and dispositional report dated July 21. The juvenile court also received live testimony from Mother at the time of the hearing.

1. Interim Review Report

According to the interim review report, Father suffered from cancer and his health condition had deteriorated over the course of several months. As a result, CFS did not recommend dismissing the dependency proceeding at that time.

According to the report, social workers made an unannounced visit to Mother and Father's home on April 19, 2022. They discovered B.J. confined in a bedroom, behind a baby gate, while looking out to the living area where cartoons were playing on a television. Cereal and other food items were on the floor around B.J.'s feet. The social workers observed a mattress in the bedroom with no bedding, displaying urine stains and black dust. The bedroom also contained a foam mattress that had been torn, which Mother identified as B.J.'s bed. During this visit, social workers reviewed B.J.'s case plan with the parents, including reminding the parents of necessary classes and the need to schedule a developmental assessment for B.J.

On April 23, 2022, social workers conducted another unannounced visit to the home. B.J. was again found confined in the bedroom, behind a baby gate, in a soiled diaper. When social workers asked if Mother and Father take B.J. out of the bedroom to play with him, Mother told them that they "enter the room" to play with B.J. The ripped foam mattress and the mattress displaying urine stains and black dust remained inside the

4

bedroom. When father opened the baby gate, B.J. attempted to get out of the room, but Father moved to physically prevent B.J. from doing so. Social workers again reminded Mother of the need to schedule the necessary appointments for B.J. When they attempted to leave the home, the social workers tried to get B.J. to respond by waiving and speaking directly to him, but B.J. did not respond to the stimulus.

On May 2, 2022, social workers conducted another unannounced visit of the home. They again found B.J. confined in the bedroom behind a baby gate. The torn foam mattress remained in the room, and there was a strong smell of urine emanating from the bedroom. Food was strewn across the floor of the bedroom, along with a paper plate and cookie sheet. Social workers attached photographs of the physical condition of the bedroom on the date of that visit. When the social worker inquired about the state of the bedroom, Father claimed that B.J. fed himself because B.J. did not cooperate when parents attempted to feed him. Father also could not articulate how often B.J. was permitted to leave the bedroom, stating that the parents would take him out of the bedroom to watch television, but that the parents would end up putting B.J. back in the room anytime he attempted to disturb other furniture or items. The social workers admonished Father that the state of the bedroom was unacceptable from a cleanliness standpoint, and that B.J. needed human interaction for a healthy development.

On May 3, 2022, social workers met with parents to update the case plan and provide necessary resources. They reemphasized the need for B.J. to have a developmental assessment. While Mother claimed that she called the referral for that resource, she could not document the number of calls or when those calls had been

placed. Mother also acknowledged that the parents would leave B.J. alone for hours to play quietly on his own in the bedroom.

2. June 20, 2022 Additional Information Report

According to the June 20, 2022 additional information report, a social worker made an unannounced visit to Mother's home on June 11. The social worker again discovered B.J. confined in the bedroom of the home by a baby gate. He appeared "visibly dirty," with food in his hair and with black feet. The mattress in the room was stripped of bedding and continued to display urine stains and black dust. A used, disposable microwaveable meal tray was broken and mixed in with B.J.'s toys. The rest of the home displayed no evidence of an active toddler, causing the social worker to believe that B.J. was not typically permitted to interact with others outside the bedroom. When the social worker attempted to speak with B.J., B.J. smiled but would not respond verbally. Father confirmed that B.J. had seen a dentist, but he admitted that he did not know if the developmental assessment had been scheduled as previously discussed during their team meeting. As a result, CFS recommended that B.J. be detained.

3. Detention Report and Jurisdictional/Dispositional Report

As a result of the circumstances documented in the June 20, 2022 additional information report, CFS filed a petition pursuant to section 387, which was accompanied by a detention report. CFS recommended that B.J. be placed in a more restrictive level of care.

CFS followed up by filing a jurisdictional/dispositional report in support of its section 387 petition. According to the report, a social worker met with Mother following

6

B.J.'s detention. During this meeting, Mother denied that she was unable to adequately care for B.J. and blamed Father for B.J.'s lack of care. She acknowledged that B.J. was being kept confined in a bedroom, but she claimed that she had the intention of hiring a babysitter. When asked about her failure to schedule the necessary medical appointments and assessments, Mother claimed that she had plans to do so in the future. A social worker met separately with Father, who expressed his view that parents should have permitted B.J. to stay with his prior caretakers. Father acknowledged that he was dealing with chronic health issues that impacted his ability to care for B.J. and expressed remorse about the situation in which B.J. had been placed.

The social worker's assessment of the family acknowledged that Mother had consistently tested clean, obtained employment, and been able to maintain steady housing for the family. CFS detailed that both parents completed multiple parenting classes and eight sessions of parent child interaction therapy, but the social worker opined that the parents had been unable to demonstrate significant benefit from those services. Based upon the social worker's observations during prior visits, it appeared B.J. was being confined in unsanitary conditions. It appeared that during his time with his parents, B.J. had not met his developmental milestones.

The jurisdictional/dispositional report also set forth further investigation regarding Mother's child welfare history in the State of Oregon. It was reported that Mother refused child welfare services assistance with respect to one of her children, who subsequently suffered an accidental death as the result of improper care. A second child

was removed from Mother's care after he was born "medically fragile," and Mother was not able to reunify with that second child.

Finally, the social worker reported that she witnessed a scheduled visit between B.J. and his parents on July 11, 2022. When the parents arrived, Mother verbally called out to B.J., but B.J. did not move toward Mother and simply looked at her expressionless. B.J. briefly played with some toys Mother brought to the visit but then chose to return to his caregiver, suggesting a lack of relationship with either parent.

### 4. August 12, 2022 Additional Information Report

According to the August 12, 2022 additional information report, both Mother and Father attended a scheduled visit with B.J. on August 7. During that visit, the parents did not interact with each other. The caregiver also reported that Mother brought an unknown adult male with her to the visit, and the man stayed around the family the duration of the visit. The report also detailed that B.J.'s current caregiver had already scheduled B.J. for an audiology appointment, had been in contact with B.J.'s pediatrician to obtain a referral for speech therapy, and had identified a speech therapy provider for B.J. upon receipt of the pediatrician's referral.

### 5. Mother's Testimony

Mother offered her own testimony at the time of the hearing on the section 387 petition. She did not agree with the allegation that she was unable to meet B.J.'s basic needs. According to Mother, when the dependency case first started, she was informed that she needed to complete various programs and stated that, as a result, she completed

parenting classes and counseling, passed all of her random drug screens, obtained employment, and obtained stable housing.

Mother testified that the dirty mattress that social workers reported seeing was her bed, and that B.J. normally slept in a bed located in the living room. Mother authenticated various pictures, which she testified described their actual living situation. She acknowledged that Father was struggling with his health, but she believed Father remained strong enough to care for B.J. while she was at work. Mother stated that she would personally return home from work during her lunch breaks to feed and change B.J. She also stated that she had arranged for alternative childcare, should B.J. be returned to her custody.

Mother admitted that she and Father would often use a baby gate to keep B.J. confined in the bedroom of their home. However, she stated that they did so only to keep B.J. from climbing and hurting himself when they needed to attend to other matters around the home. Mother claimed she would take B.J. out of the bedroom whenever she was home. She explained that the observations made by social workers regarding B.J.'s confinement were the result of poor timing, as unannounced visits often coincided with Mother's sleep schedule.

On cross-examination, Mother admitted that she did not know how long B.J. would be kept confined in the bedroom while Mother was at work, and further admitted that she could not recall any occasion when she discovered B.J. outside the bedroom upon her return from work. She explained that on a typical day, she would wake up around 9:00 a.m. and take B.J. out of the bedroom to feed, change, and play with him

9

until approximately 11:30 a.m. She would then return B.J. to the bedroom while she got ready for work. Mother would then spend another 30-45 minutes with B.J. when she returned home during her lunch break.

Mother admitted that a social worker had asked her to schedule an autism assessment for B.J. months earlier, but Mother claimed that she was unable to do so because the referral never returned her calls. She further admitted that she had begun looking for alternative childcare in May because Father's health appeared to be noticeably deteriorating. Mother acknowledged that she had some concern regarding B.J.'s speech development, but she was informed by the maternal grandmother that it was common in her family for kids to not speak at all until three years of age. When asked if B.J. ever left the home, Mother stated that she would occasionally take B.J. shopping and to the park when she had the opportunity.

C. *Findings and Order*

At the conclusion of the hearing on the section 387 petition, the juvenile court found that the previous disposition returning B.J. to Mother and Father's custody had been ineffective in the rehabilitation or protection of B.J. The juvenile court further found that clear and convincing evidence showed that B.J. should be removed from the custody of his parents because continuance in their home posed a substantial danger to B.J.'s physical health, safety, protection, or physical or emotional well-being. As a result, the juvenile court sustained the allegations of the supplemental petition and ordered B.J. removed from his parents' custody. Mother appeals from this order.

## III. DISCUSSION

A. *General Legal Principles and Standard of Review*

"A section 387 supplemental petition . . . is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care." (*In re D.D.* (2019) 32 Cal.App.5th 985, 989-990; see *In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)

"The hearing on a supplemental petition is bifurcated. [Citations.] The court first conducts an adjudicatory hearing at which it must find by a preponderance of the evidence that the factual allegations of the supplemental petition are or are not true, and that the allegation that the previous disposition has not been effective is or is not true. [Citations.] The rules governing jurisdictional hearings apply to the adjudicatory hearing phase on a supplemental petition." (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) During this jurisdictional phase, the department "need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1161.)

"If the court finds that the allegations of a supplemental petition are true, it conducts a further dispositional hearing to determine whether there is a need to remove a child from his or her current level of placement. [Citations.] The rules that govern an initial disposition hearing apply to a further dispositional hearing on a supplemental petition." (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) In this phase, the juvenile court

11

must find by clear and convincing evidence that the conditions for removal under section 361, subdivision (c), are met. (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163; *In re C.M.* (2017) 15 Cal.App.5th 376, 388 [" 'The standard of removal on a supplemental petition is the same as removal on an original petition.' "].) Generally, "[a] removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W.*, at p. 1163; *In re D.D.*, at p. 996.)

" 'We review an order sustaining a section 387 petition for substantial evidence.' [Citations.] Evidence is substantial if it is ' " ' "reasonable, credible, and of solid value." ' " ' [Citation.] 'We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding.' " (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) The appellant "bears the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*Ibid.*)

B. *Substantial Evidence Supports the Finding that the Previous Disposition Was Ineffective*

Mother's first argument on appeal is that there was insufficient evidence to support the juvenile court's finding that the previous disposition was not effective in the rehabilitation or protection of B.J. We disagree.

The reports admitted into evidence at the time of the hearing on the section 387 petition showed that social workers made unannounced visits to Mother's home on at least four occasions over the course of a two-month period.[2] On each of these visits, social workers reported finding B.J. in nearly identical conditions—confined alone in a bedroom. On each of these visits, social workers observed that B.J. appeared unclean, and the state of the bedroom appeared unsanitary. They reported that the parents would not permit B.J. to leave the room, even to interact with the social workers, and further reported that B.J. appeared to be developmentally delayed in his speech and ability to engage in age-appropriate social interaction. Despite this, Mother and Father failed to schedule necessary medical appointments and developmental assessments to address B.J.'s need for specialized services, even when repeatedly prompted by social workers to do so over the course of several months. These reports constitute substantial evidence upon which the juvenile court could rely to conclude that the previous disposition returning B.J. to Mother and Father's care had not been effective.

On appeal, Mother repeatedly argues that she "could" remedy the situation if given the opportunity to do so, emphasizing her own testimony that she was ready to hire a babysitter to assist with B.J.'s care. However, the juvenile court expressly found Mother's testimony lacked credibility and, in reviewing the record for substantial evidence, this court does not reweigh the credibility of witnesses. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811-812.) Further, even if Mother presented credible

---

[2] Specifically, social workers visited the home unannounced on April 19, April 23, May 2, and June 11, 2022.

testimony on this point, it would not be grounds for reversal of the juvenile court's order, since the juvenile court's decision "will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the [juvenile] court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

We are also unpersuaded by Mother's argument that she was unable to schedule necessary medical appointments and developmental assessments due to factors outside of her control. In support of this argument, Mother implies that CFS and B.J.'s current caretaker were equally unable to schedule the necessary assessments to ensure B.J.'s healthy development. However, the record suggests otherwise. B.J. was taken back into protective custody on June 20, 2022. The August 16 additional information report noted that B.J.'s caretaker had already scheduled an audiology appointment, been in contact with B.J.'s pediatrician to obtain a speech therapy referral, and had already identified a speech therapy provider for B.J. once the referral was processed. This was substantial evidence upon which the juvenile court could rely to conclude that Mother was not credible in claiming that she attempted to schedule necessary assessments but was ignored by care providers.

We conclude that substantial evidence supports the juvenile court's finding that the previous disposition returning B.J. to his parents' custody was ineffective at the rehabilitation and protection of B.J. Thus, we decline to reverse the juvenile court's order on this basis.

C. *Substantial Evidence Supports the Juvenile Court's Removal Decision*

The second argument advanced by Mother on appeal is that insufficient evidence supports the juvenile court's dispositional order removing B.J. from her custody. Specifically, Mother argues that there was no clear and convincing evidence of a substantial risk of harm to B.J. absent removal. Again, we disagree.

Initially, we briefly address Mother's suggestion that a child cannot be removed pursuant to section 361, subdivision (c), absent a risk of physical harm, relying on *In re Isayah C.* (2004) 118 Cal.App.4th 684. We observe that section 361, subdivision (c)(3), expressly provides that removal may be appropriate if "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior . . . ." (§ 361, subd. (c)(3).) More importantly, this court has previously rejected such a restrictive reading of the removal statute (see *In re J.S.* (2014) 228 Cal.App.4th 1483, 1493-1494, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4), and the Court of Appeal that issued the opinion in *In re Isayah C.* has since reexamined its reasoning in that case to reach a different conclusion (*In re H.E.* (2008) 169 Cal.App.4th 710, 720-723). Nevertheless, even assuming that the juvenile court was limited to considerations of potential physical harm to B.J., we would conclude that substantial evidence in the record supports such a finding.

In this case, the evidence showed that B.J. was a toddler who had yet to reach two years of age when he was returned to his parents' custody. Despite his young age, social workers consistently discovered that B.J. was kept isolated in a bedroom. Mother's own

testimony suggested that this isolation would persist for hours at a time and comprised the majority of B.J.'s waking hours in the day. Social workers documented what they believed to be noticeable regressions in B.J.'s development, noting that B.J. stopped speaking and demonstrated an inability to appropriately respond to human interaction. Further, Mother's own testimony established that she was concerned about B.J.'s speech development, suggesting that she also noticed signs of developmental delay. Despite this, Mother acknowledged that she failed to make any of the recommended appointments to obtain necessary medical or developmental services for B.J. This was substantial evidence upon which the juvenile court could rely to conclude that there was a substantial risk of harm to B.J. if he was to remain in Mother's custody.

We acknowledge that the evidence in this case does not suggest B.J. would have been subjected to any specific physical injury. We also acknowledge all of the efforts Mother did make in completing various assigned programs. However, under section 361, subdivision (c)(1), a removal order is proper if the juvenile court finds clear and convincing evidence that "[t]here is or would be a substantial danger to the physical *health* . . . or physical or emotional *well-being* of the minor . . . ." (§ 361, subd. (c)(1), italics added.) Thus, the plain words of the statute make clear that the juvenile court's consideration is not limited to the threat of specific physical injuries but includes the consideration of the risk of substantial harm to a child's health and development. We have no hesitation in concluding that evidence of routine, prolonged isolation of a toddler who is already displaying signs of developmental delays represents a substantial risk to the toddler's physical health and well-being. Further, Mother and Father's admitted

16

inability to obtain the necessary care and services to address B.J.'s developmental delays was also evidence that the juvenile court was entitled to consider in assessing the risk of harm to B.J. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1126 ["[M]other's failure to ensure that [the dependent child] attended his specialized school, and her failure, and even resistance, to procuring appropriate services . . . , placed [the dependent child] at substantial risk of serious harm."].)

We are unpersuaded by Mother's argument that removal was inappropriate because "[t]he problem was Father was dying of brain cancer and he was the main caretaker/homemaker . . . ." As our Supreme Court has explained, a parent need not be "blameworthy for her failure or inability to supervise or protect her child" in order to support a dispositional order of removal. (*In re R.T.* (2017) 3 Cal.5th 622, 624; *In re D.L.* (2018) 22 Cal.App.5th 1142, 1148 [" '[T]here need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order.' "].) " 'Rather than focusing on parental fault or blameworthiness, the focus instead is on "whether the child is at 'susbstantial risk' of 'serious physical harm or illness.' " ' " (*Guardianship of Saul H.* (2022) 13 Cal.5th 827, 851.) Thus, even if it was true that most of the blame for the parents' inability to adequately provide for B.J. can be directed at Father's deteriorating health condition, that would not be a basis for reversal of the juvenile court's order.

We conclude that substantial evidence in the record was sufficient to support the juvenile court's finding that clear and convincing evidence showed B.J. faced a

17

substantial risk of harm if left in the custody of Mother and Father.  Thus, we find no basis to reverse the juvenile court's dispositional order on this ground.

## IV.  DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
                                                                    J.

We concur:

CODRINGTON _____
           Acting P. J.


RAPHAEL _____
                  J.

18